[Cite as *State v. Newberry*, 2023-Ohio-3623.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                           No. 111431

    v.                           :

RONALD NEWBERRY,                        :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 5, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-642539-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl M. Felice, Assistant Prosecuting Attorney, *for appellee*.

Katerina MacGregor; Law Office of Attorney Kimberly Kendall Corral and Gabrielle Ploplis, *for appellant*.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Ronald Newberry appeals his convictions for aggravated murder, murder, kidnapping, aggravated burglary, aggravated arson, felonious assault and having weapons while under disability following a jury trial in the Cuyahoga County Court of Common Pleas. The charges stemmed from an

investigation into the deaths of Paul Bradley ("Paul" or "Paul B.") and his 14-year-old daughter P.B.  Paul and P.B. were found dead in a burning car at a vacant property in East Cleveland on October 10, 2018.

{¶ 2} Newberry raises twelve alleged errors in the trial.  He claims that the trial court should have disqualified one of the jurors, his trial counsel was ineffective and had a disqualifying conflict of interest and that various pieces of evidence should have been excluded.  He also argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 3} For the reasons that follow, we affirm.

## I.    Factual Background and Procedural History

{¶ 4} On July 31, 2019, a Cuyahoga County Grand Jury indicted Ronald Newberry and two codefendants — Kodii Gibson and DeMarcus Sheeley — in a fifteen-count indictment.[1]  The indictment alleged that Newberry committed the following offenses on or about October 10, 2018:

Counts 1 and 3: Aggravated murder of P.B., in violation of R.C. 2903.01(A) and (B)

Counts 2 and 4: Aggravated murder of Paul B., in violation of R.C. 2903.01(A) and (B)

Count 5: Kidnapping of P.B. in violation of R.C. 2905.01(A)(3)

Count 6: Kidnapping of Paul B. in violation of R.C. 2905.01(A)(3)

Count 7: Aggravated burglary in violation of R.C. 2911.11(A)(1)

---

[1] Kodii Gibson's companion case in the common pleas court is Cuyahoga C.P. No. CR-19-6492539-B.  DeMarcus Sheeley's companion case in the common pleas court is Cuyahoga C.P. No. CR-19-642539-D.

Count 8: Aggravated arson in relation to Paul B., in violation of R.C. 2909.02(A)(1)

Count 9: Aggravated arson in relation to P.B., in violation of R.C. 2909.02(A)(1)

Count 10: Murder of P.B., in violation of R.C. 2903.02(B)

Count 11: Felonious assault of P.B., in violation of R.C. 2903.11(A)(1)

Count 12: Murder of Paul B., in violation of R.C. 2903.02(B)

Count 13: Felonious assault of Paul B., in violation of R.C. 2903.11(A)

Count 14 did not apply to Newberry.

Count 15: Having weapons while under disability, in violation of R.C. 2923.13(A)(3)

{¶ 5} Each of counts 1, 2, 3, 5, 6, 7, 10 and 11 carried one- and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A). Count 13 carried an accelerant specification under R.C. 2941.1425(B).[2]

{¶ 6} The prosecution's theory of the case was that Newberry, Gibson and Sheeley participated in a "crime spree" on October 10, 2018, which culminated in the murders of Paul and P.B. They broke into Paul's house in Bedford and kept Paul and P.B. detained there between 3 a.m. and 6 a.m. while they ransacked the house and stole items of value. Then they drove Paul and P.B. — in a silver Buick LaCrosse that Paul was renting — to an abandoned house on Wadena Avenue in East Cleveland and kept them there for over two hours while Gibson called his girlfriend to bring him a gasoline can and while Gibson and Sheeley walked to a nearby gas

---

[2] The indictment also included capital specifications under R.C. 2929.04(A)(5) and 2929.04(A)(7) but the state voluntarily dismissed those specifications before trial.

station, and back, to fill it up. Shortly after 9 a.m., they drove Paul and P.B. — again in Paul's car — to a vacant lot on Savannah Avenue in East Cleveland, where they shot P.B. to death and burned Paul alive. Newberry, Gibson and Sheeley used Newberry's car — which had been recently purchased in Newberry's mother's name — throughout these events. Newberry returned the car to the dealership in an attempt to lose evidence and conceal his involvement in the crime. When investigators suspected Newberry's involvement, he and his mother created a fake person — "Jamaican Shawn" — to conceal Newberry's participation in the murders. The state readily admitted that its case against Newberry was circumstantial.

{¶ 7} The defense did not dispute that someone broke into Paul B.'s house, robbed him, kidnapped both him and his daughter and brutally murdered them. The defense did not even dispute that Newberry's car was used in the commission of those offenses. But the defense was adamant that Newberry was not involved in those crimes. The defense argued to the jury that Newberry routinely allowed others to use his car and phones and said that all the circumstantial evidence tying Newberry to the murders was explained because Newberry allowed others to use his car and phone at the time of the crimes. Newberry voluntarily turned himself in, spoke to the police and consented to the collection of his DNA, all because he knew he did nothing wrong. He returned his car because he knew his friends had committed a crime in it.

{¶ 8} A jury trial on the charges commenced on February 25, 2022 and the jury returned its verdict on March 16, 2022.

### A. Voir Dire

{¶ 9} During voir dire, prospective juror No. 31 requested a sidebar conference and disclosed that the juror's daughter "is friends with the victim's daughter." The juror reported that this fact would not affect his ability to be fair and impartial. The juror had not spoken with his daughter "for at least four years." Neither party moved to exclude juror No. 31 and the juror served on the jury.

### B. Waiver of Potential Conflict

{¶ 10} Before opening statements began on March 7, 2022, the trial court discussed several preliminary matters with the parties including a potential conflict that had been identified with respect to one of the defense counsel.

{¶ 11} The prosecutor related to the court that the state had "discussed several times off the record" with the defense that one of the defense attorneys had previously represented Joseph D. Marché — an East Cleveland police officer who was involved in the investigation of the case as a detective — "and others in East Cleveland." The prosecutor noted that the representation was in a civil case and requested "that we go on the record and waive any potential conflicts."

{¶ 12} Defense counsel then explained that he previously represented Marché and approximately three other East Cleveland employees in "a civil matter where * * * a citizen[] had brought an action again[st] East Cleveland's police department for not being accredited, for not having their shooting records in line or qualifying records, not having their continuing education, things like that." Counsel said that he had filed a motion to withdraw in that matter and the case was

ultimately dismissed by the trial court. Counsel stated that he did not recall ever speaking with Marché about that civil case and described that counsel's role had been limited to gathering records from state agencies and producing those records to the trial court. Counsel then said as follows:

> Nothing about this case or any other case, for that matter, was ever discussed. I've other cases against the Commander [Marché] where I've cross-examined him. I have no problem doing my job in this case. I didn't learn anything from that representation about my client or any other client, for that matter.

{¶ 13} Immediately after defense counsel's explanation, the trial court discussed the matter with Newberry, as follows:

> THE COURT: Mr. Newberry, is that okay with you? After that's all been disclosed, are you okay?
>
> [NEWBERRY]: Yes.

{¶ 14} The trial court then asked counsel for the parties if there was anything else they would like to put on the record regarding the potential conflict issue. Counsel had nothing further to say about it.

**C. The State's Case**

{¶ 15} The state called nineteen witnesses in its case-in-chief.

**1. The Examination of John Hartman**

{¶ 16} John Hartman testified that he is employed as a police sergeant with the East Cleveland Police Department. He said he has been a police officer in East Cleveland for six years and was promoted to the rank of sergeant in August 2021.

{¶ 17} Hartman was working as a patrol officer on October 10, 2018. At around 9:30 a.m. that day, he responded to a vacant field on Savannah Avenue in

East Cleveland regarding a report of a vehicle on fire. As Hartman arrived, he saw a car on fire. The fire department was already on scene and working to extinguish the fire.

{¶ 18} Hartman and other officers who responded to the scene that day wore city-issued body-worn cameras. The state played a video recording from one of those cameras. The video depicts a car parked on a grassy lot between two houses. The car's trunk is partially open and flames stream from the vehicle. Firefighters walk around the car, dousing the car with water from a firehose.

{¶ 19} Hartman testified that one of the firefighters notified him that there were two bodies inside the vehicle. Hartman approached within three feet of the car and smelled the odor of burnt flesh. He saw two people in the back seat; they were both deceased and "extremely burned." He observed that both people appeared to be bound at the wrists and "[i]t looked like they were wrapped with cloth." Hartman then notified his supervisors and began to "establish the crime scene."

### 2. The Examination of Jennifer Heard

{¶ 20} Jennifer Heard testified that she met Paul B. in 2003 and they dated "on and off" from that point forward. They have three children together. Paul also had other children, including P.B., for whom Heard is not the mother.

{¶ 21} Paul served a three-year sentence in federal prison for drug trafficking. After Paul's release from prison, he and Heard lived together until 2018. They bought a house on Gould Avenue in Bedford, Ohio in 2013 and Heard stayed

there "on and off" over the years. The house was a two-story, single-family residence with a detached garage.

{¶ 22} Heard never knew Paul to hold a steady job after his release from prison but he had money such that he could pay for household expenses and basic needs and provide for his children. He also liked to go to the casino and often he would go seven days a week. Paul gambled with large sums of money, thousands of dollars at a time. Paul had over $5 million in receipts at the Jack Casino alone, owned two properties and used at least two phones. She said she believed Paul made his money through gambling.

{¶ 23} In June 2018, Paul called Heard and asked her to drive to meet him at a hotel in the Brecksville–Broadview Heights area of Ohio. When she arrived, Paul put a black duffle bag in the back of her car; the bag was branded from the Jack Casino. Heard was stopped by the Ohio State Highway Patrol on her way home from the hotel. Troopers searched the bag, finding that it contained approximately $345,000 in cash. Heard and Paul never talked about why the bag held that much cash.

{¶ 24} P.B. entered the ninth grade at school in August 2018; she was living with Paul at the house on Gould Avenue that fall.

{¶ 25} In September and October 2018, Paul was renting a Buick, which had out-of-state license plates. It was his habit to rent cars, as opposed to buying a vehicle, after his release from prison.

{¶ 26} Heard drove to the Gould Avenue house at around 11:30 p.m. on October 9, 2018, to deliver P.B. a bookbag that P.B. had left at a relative's house the weekend before. Heard parked in the driveway and called Paul, who was home with P.B. at the time, and P.B. came outside and grabbed the bag from Heard. P.B. kissed Heard's 16-month-old son, who was in the car with Heard, then went back inside the house.

{¶ 27} Heard drove around the corner to Paul's sister's house, where she stayed that night. She woke up around 6:45 a.m. on October 10, 2018, and called Paul's and P.B.'s phones which they did not answer. Later that morning she drove to the Gould Avenue house and found that the street was blocked off by emergency vehicles. She was informed that Paul's vehicle had been found, burned, in East Cleveland and that Paul and P.B. had been found deceased inside of it.

{¶ 28} Heard was allowed back inside the Gould Avenue house on October 11, 2018. She found that each floor of the home was "[r]ansacked." She took an inventory and reported to police that several items of value were missing, including two PlayStation videogame consoles and controllers, a pair of burgundy shoes, a Ferragamo belt and Paul's earrings and watch. She identified a picture taken of Paul's son when he went to prom, which she said depicts the son wearing the Ferragamo belt that was taken.

{¶ 29} On cross-examination, Heard admitted that she never saw Paul and Newberry together. She did not know Newberry prior to this case and did not know

the extent of the relationship, if any, between Paul and Newberry or the degree to which they ever had contact.

### 3. The Examination of Michael Griffis

{¶ 30} Michael Griffis testified that he is employed as a police officer by the city of Solon and serves as a narcotics detective with the Southeast Law Enforcement ("SEALE") narcotics task force. He described SEALE as "a multi-jurisdictional task force" that primarily investigates drug trafficking. He testified to the following facts relevant to this investigation.

{¶ 31} Before Paul B.'s death, law enforcement officers suspected that he was involved in "heroin trafficking." In 2015, Griffis was involved in an investigation targeting Paul; officers bought approximately ten grams of heroin from Paul through a confidential informant. That investigation ended when the confidential informant stopped cooperating.

{¶ 32} On cross-examination, Griffis admitted that drug traffickers often use rental cars to hide their identity and avoid forfeiture.

{¶ 33} On October 10, 2018, Griffis conducted a welfare check at Paul B.'s house in the late morning or early afternoon. He and another detective found the rear door open. They entered the house and saw a red liquid on the floor in several rooms. The odor of gasoline was "really strong" so they backed out of the house and contacted the gas and electric utility companies and the fire department to make sure it was safe for them to enter. The gas and electricity services to the home were cut off for safety. Once the house was rendered safe, Griffis and the other detective

went through the property and found no one inside. The house looked like it had been "tossed."

### 4. The Examination of Christopher Wilson

{¶ 34} Christopher Wilson testified that in October 2018 he was employed as a special agent with the Ohio Bureau of Criminal Investigation ("BCI").

{¶ 35} On October 10, 2018, Wilson responded to the Savannah Avenue crime scene at approximately 11:48 a.m. to photograph the scene. He observed two bodies in the back seat of the burned-out vehicle; the victims appeared to have their hands bound. One was positioned with the head facing the driver's side of the vehicle; the other was positioned behind the first, with the head facing the passenger side. Wilson observed a "pinkish liquid drip stain" on the outside of the vehicle, near the gas tank.

{¶ 36} After photographing this scene, Wilson drove to Paul B.'s home on Gould Avenue in Bedford to take photographs and assist with the processing of evidence there.

{¶ 37} There was a "strong chemical odor" when he entered the home. There was a "reddish liquid" on the "floor, furnishings, and household items throughout the house"; the State Fire Marshal's Office collected samples of the liquid for testing as a suspected accelerant. The house "appeared to have been rummaged through." In one of the bedrooms, there were "drawers from the nightstand pulled out and various household items strewn throughout the floor."

{¶ 38} There were stains on a wall and closet on the first floor of the home that tested presumptively positive for blood. There was a fragment of a blue examination glove on the floor of the living room near the blood stains; it appeared that the suspected accelerant was on the glove.

{¶ 39} There were items "consistent with drug activity" located in the basement, including blender components, weights and a digital scale.

{¶ 40} BCI collected the items of physical evidence identified as potentially relevant to the investigation. BCI also collected "blind swabs" of various surfaces at the home, to test for the "presence of skin cells and potentially extract DNA profiles from those skin cells."

### 5. The Examinations of Jeffrey Koehn and Mollie Jordan

{¶ 41} Jeffrey Koehn testified that he has been employed as a fire and explosion investigator by the Ohio State Fire Marshal's Office for twelve and a half years. He said he was a firefighter and fire investigator in Trumbull County for thirteen years before joining the Fire Marshal's Office and remains a part-time firefighter in Geauga County. The state offered Koehn as an expert in determining the origin and cause of fires and explosions and the defense stipulated to his qualifications.

{¶ 42} Mollie Jordan testified that she has been employed by the State Fire Marshal's forensic lab for eleven years. The state offered her as an expert in fire debris analysis and the defense stipulated to her qualifications.

{¶ 43} Taken together, their testimony established the following facts and conclusions relevant to this investigation.

{¶ 44} Koehn was called to the Savannah Avenue crime scene on October 10, 2018. He smelled the odor of gasoline and "burnt flesh" while he was processing the scene. The odor of gasoline was "very strong," such that one could smell it out to 20 feet from the vehicle. "Depending how the wind blew," he said, "you could get it even further away." Koehn learned that the burned-out vehicle was registered to a rental agency in Cleveland and that the vehicle had been rented to Paul B.

{¶ 45} Koehn examined the vehicle at the scene and later processed the vehicle for evidence at the medical examiner's office. A hole was found on the underside of the vehicle, surrounded by a "red stain"; this was later determined to be a bullet hole surrounded by blood. Blood stains were also found in the vehicle. Bullets and cartridge cases were found on the passenger side in the rear seating compartment. There was a "reddish pinkish liquid" on the outside of the vehicle on the rear passenger side. Samples were taken from the interior of the vehicle and from the clothing on Paul's and P.B.'s bodies and tested for gasoline.

{¶ 46} Jordan conducted forensic tests on these samples. Every sample taken from inside of the burned-out car tested positive for gasoline, including samples taken from the clothes of the victims.

{¶ 47} Koehn's expert conclusion was that the vehicle fire was caused by a person who intentionally set fire to the vehicle by applying an open flame — most likely a lighter or a match — to gasoline, which had been intentionally applied to the

vehicle and the victims. Koehn's analysis of the scene led him to conclude that the fire had spread from the front of the car — where the fire had been hot enough to melt the car's windshield and aluminum hood — to the rear. He also concluded that the fire spread from the interior of the vehicle to the exterior.

{¶ 48} Later, Koehn examined the dark blue 2010 Ford Edge that Newberry had been using in October 2018. A trained accelerant-detecting dog alerted to the exterior of the car and various places inside the car. Koehn collected eight samples from the vehicle.

{¶ 49} Jordan conducted forensic tests on these samples. A sample taken from the front driver's seat of Newberry's car tested positive for gasoline, as did a sample taken from the "rear carpet area" of his car. A sample taken from plastic bubble wrap in Newberry's trunk tested positive for gasoline and "medium petroleum distillate." Medium petroleum distillates include charcoal lighter fluid, paint thinner and tiki torch fuel.

{¶ 50} On cross-examination, Koehn admitted that no investigator tested the clothing of any living person for the presence of accelerants. He further admitted that he could not tell how much gasoline was present in the Ford Edge; it is possible that there were only "drops" of gasoline there. He further admitted that it is possible to transfer gasoline from one item to another. He continued as follows:

> DEFENSE COUNSEL: [I]f I cut lawns for a living, right, and I'm pouring gasoline into weed whackers, blowers, lawnmowers, I get in my truck everyday, am I going to have gasoline on my seat?
>
> A: It's possible.

{¶ 51} Koehn said he was not able to say whether the gasoline detected in the Ford Edge was "transfer material."

**6. The Examinations of Joseph Stevens and Christa Rajendram**

{¶ 52} Joseph Stevens testified that he is employed as a fire investigator for the State Fire Marshal's office. He said he has been in that role for seven years and was employed as a firefighter for 20 years before that. The state offered him as an expert in determining the origin and cause of fires and the defense stipulated to his qualifications.

{¶ 53} Christa Rajendram testified that she is employed as a forensic lab supervisor by the State Fire Marshal Forensic Lab. She said she has worked at the lab for approximately 28 years, detecting and analyzing ignitable liquids, among other things and has a Ph.D. in chemistry. The state offered her as an expert in the field of fire debris analysis and the defense stipulated to her qualifications.

{¶ 54} Taken together, their testimony established the following facts and conclusions relevant to this investigation.

{¶ 55} Stevens responded to Paul B.'s Gould Avenue home on October 10, 2018, after police officers approaching the home "smelled the fumes from ignitable liquid coming out of the house." When he arrived, he also smelled "a distinct odor of gasoline" at the house.

{¶ 56} Stevens walked through the home and saw a "pinkish reddish" liquid throughout the house. Stevens collected three samples of the liquid from various places inside the home and submitted them to a laboratory for identification.

{¶ 57} Rajendram forensically tested the samples collected by Investigator Stevens from Paul B.'s home. The red liquid on the samples was a mixture of gasoline, a medium to heavy petroleum distillate and a petroleum-based oil. Petroleum-based oils include motor oil and transmission fluid.

{¶ 58} Stevens identified that there were a couple pieces of paper in the basement of the home that someone had twisted up, indicating that the person intended to "control the burn of that particular piece of paper." His training told him that a person can use a twisted piece of paper like he found "as a wick or something to * * * initiate and ignite" a flammable liquid. The "pinkish reddish" liquid that had been found throughout the house was also found on these two twisted pieces of paper.

{¶ 59} Through his examination, Stevens concluded that a person or multiple people had poured an ignitable liquid throughout the home, including in the basement and on the first and second floors of the home. Stevens found no fire damage inside the house but he noted that there was a hot-water tank and a furnace in the basement and a gas stove in the kitchen, among other possible "ignition sources." He explained that the fumes from the ignitable mixture poured throughout the house could have ignited from these sources, like the pilot light of one of the gas appliances.

{¶ 60} On cross-examination, Stevens admitted that the wicks he found — the twisted pieces of paper — had not been burned. He admitted that it did not look like there had been any fire at the house. He did not know how long the ignitable

mixture had been in the house and did not know how long it takes for gasoline to evaporate.

### 7. The Examination of Phillip Howell

{¶ 61} Phillip Howell testified that he is employed as a police detective with the City of East Cleveland.

{¶ 62} On October 16, 2018, Howell talked to a homeowner on Savannah Avenue who maintained a video surveillance system. Howell obtained a search warrant and gathered the recording system for review.

{¶ 63} On November 9, 2018, Howell obtained a gas-station owner's consent to collect recordings from the gas station's video surveillance system. The gas station was located on Euclid Avenue near the Savannah Avenue crime scene.

{¶ 64} On cross-examination, Howell admitted that he did not inquire as to which employees were working at the gas station on October 9 and 10, 2018. He also did not ask for transaction history like credit-card receipts from those days.

{¶ 65} On November 10, 2018, Howell went to an abandoned residence on Wadena Avenue in East Cleveland, where there "was kind of * * * like a dump site." The home was "right around the corner" from the Savannah Avenue crime scene and investigators "had information that the suspects were at that residence" with Paul and P.B. Howell searched the outside of the residence and found examination-gloves — some blue and others clear — scattered around the home's driveway and backyard. The gloves were collected as evidence.

{¶ 66} On cross-examination, Howell admitted that no investigator went into the house at the "dump site" on Wadena Avenue, despite investigators' belief that the site was the staging area for the homicides.

{¶ 67} On November 12, 2018, Howell went to a CPR Cell Phone Repair store in Mayfield Heights, Ohio based on "information that one of the suspects had taken a PlayStation from the victim's house in Bedford and that the item was there at that CPR store." Howell collected a PlayStation videogame console from the store as evidence.

{¶ 68} On cross-examination, Howell admitted that no investigator collected security-camera recordings from that store.

### 8. The Examination of James Kooser

{¶ 69} James Kooser testified that he has been employed as a firearms and tool marks examiner by the Cuyahoga County Regional Forensic Science Laboratory for approximately five and a half years and was a Cleveland police detective for over 30 years before that. The state offered him as an expert in the field of firearm and tool mark examination and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

{¶ 70} Kooser examined two spent bullets and five fired cartridge cases found in the burned-out Buick Lacrosse, as well as two spent bullets recovered from P.B.'s body. He determined that all five of the fired 9 mm cases were fired from the same Glock pistol. He determined that all four spent bullets — which were each 9 mm caliber — were fired from the same gun, which could have been manufactured

by one of several manufacturers, including Glock. Kooser said it was his belief that all the bullets and all the cases were fired from the same Glock pistol.

### 9. The Examination of Curtiss Jones

{¶ 71} Curtiss Jones testified that he is employed by the Cuyahoga County Medical Examiner's Office as a supervisor for 19 years in the trace-evidence unit. The state offered him as an expert in trace evidence analysis and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

{¶ 72} The medical examiner's office received the silver Buick LaCrosse containing Paul's and P.B.'s bodies on October 10, 2018. Jones removed Paul and P.B. from the vehicle and processed trace evidence from their bodies.

{¶ 73} Paul was in "the rear bench seat of the vehicle with head towards the driver's side of the vehicle and facing forward in the vehicle." There was burned white fabric, possibly from a "hooded garment," around his neck. He also had burned green fabric around his neck, which could have been tied in a knot. He had a "USB style charging cord" wrapped around his wrists and knotted into a binding; a piece of clear tape was found melted onto the cord. He had an "orange electrical extension cord" wrapped around his ankles and knotted into a binding.

{¶ 74} P.B. was also in the back seat, oriented with her head towards the passenger side. P.B.'s wrists and ankles had not been bound.

{¶ 75} Five cartridge cases and two spent bullets were found in the back seat of the vehicle.

{¶ 76} The medical examiner's office received Newberry's Ford Edge for processing on November 29, 2018. Jones collected samples from inside and outside the vehicle to look for bodily fluids, hair and DNA.

### 10. The Examination of Andrew Harasimchuk

{¶ 77} Andrew Harasimchuk testified that he is a special agent with BCI and has been employed in that capacity for seven years.

{¶ 78} East Cleveland police asked BCI to process Newberry's Ford Edge for blood and gunshot residue. Harasimchuk and another special agent, Dan Boerner, processed the vehicle on November 6, 2018. Harasimchuk understood that the vehicle had been at an automobile dealership before East Cleveland police impounded it; the vehicle had been "detailed" — cleaned — twice before his examination.

{¶ 79} Harasimchuk did not test for gunshot residue because the cleanings made the test futile. He did not find blood anywhere on the inside or outside of the car.

### 11. The Examination of Lisa Moore

{¶ 80} Lisa Moore testified that she is employed as a DNA analyst by the Cuyahoga County Regional Forensic Science Laboratory, part of the medical examiner's office; she has been in that role since 2002. The state offered her as an expert in the field of forensic DNA testing and analysis and the defense stipulated to her qualifications.

**{¶ 81}** Moore swabbed both sides of the examination-glove fragment found in Paul B.'s house. She found DNA on the swab and entered the DNA profile in the Combined DNA Index System ("CODIS"), which revealed a preliminary association with Kodii Gibson. The DNA matched Gibson as the "major contributor" and one unknown contributor. There was positive match support for Newberry as the unknown minor contributor. The data generated during Moore's processing of this sample was sent to an outside lab operated by a company called Cybergenetics.

**{¶ 82}** There was no match support for Newberry, Gibson or Sheeley found on swabs taken from various places on the burned-out Buick LaCrosse, in Paul's house and on the ligatures around Paul's body. The only DNA found on those swabs was Paul's.

**{¶ 83}** The DNA from many of the samples collected from Newberry's Ford Edge matched to Newberry. Samples from the rear seating area matched to Newberry and Quentin L. Palmer. A sample from the rear passenger door hand grip matched to Sheeley. A sample taken from the rear passenger door armrest showed positive match support for Sheeley and Palmer — and P.B. But the samples from the armrest were not conclusive.

**{¶ 84}** On cross-examination, Moore admitted that it makes sense that Newberry's DNA would be in the Ford Edge if Newberry used it frequently. She further admitted that a passenger sitting in Newberry's car might pick up some of Newberry's DNA. She admitted that it is possible that the passenger could then deposit Newberry's DNA on another object sometime later.

{¶ 85} Moore admitted that, of the DNA she found on the piece of the blue glove found in Paul's home, approximately 95 percent matched to Gibson. The remaining DNA matched to a minor contributor. While there was positive match support that the minor contributor was Newberry, the match was considered inconclusive according to the medical examiner's office's standards at the time of the test.

{¶ 86} On redirect, Moore testified that Cybergenetics' TrueAllele software has been peer reviewed and was validated by the medical examiner's office.

### 12. The Examination of Quiana Gilbert

{¶ 87} Quiana Gilbert testified that Kodii Gibson is Gilbert's child's father. In October 2018, Gibson would "hang around" Newberry and Sheeley; he had done so for about six months. She used to see the three men together about once a month.

{¶ 88} On October 9, 2018, Gibson drove Gilbert to her workplace in her car, dropping her off at around 3 p.m. Newberry and Sheeley were also in the car on the drive. The plan was for Gibson to pick Gilbert up at 11 p.m. when her shift ended but at some point Gibson texted her and made clear that Gilbert needed to find a different way to get home. Gibson arranged for Sheeley's girlfriend to pick Gilbert up from work and take her home but Gilbert ultimately decided to get a ride home from a co-worker. Gilbert and Gibson were texting throughout the night of October 9, 2018.

{¶ 89} Gilbert woke up at 7 a.m. on October 10, 2018 and Gibson had not yet returned her car. She texted him to ask where her car was. That morning, she

received a call from Gibson about a gas can and, based on that conversation, brought a gas can from her house to Wadena Avenue in East Cleveland. Gibson's grandmother lived on Wadena. When Gilbert arrived at Wadena, she saw Gibson standing next to an abandoned house located two doors down from Gibson's grandmother's home. She did not see her own car. She pulled into the driveway of the abandoned house and she saw Newberry's vehicle there. She did not see Newberry.

{¶ 90} Gibson walked to the car that Gilbert was in, retrieved the gas can from her and gave her the keys to her car. She learned that her car was parked "[o]ff of 116th," the street on which Sheeley lived.

{¶ 91} After giving Gibson the gas can, Gilbert did not see him until the next day (October 11, 2018). When she saw him next, Gibson had a red duffle bag that said "JACK Casino" on it; he also had "[a] game system and a belt." She had never seen Gibson with those items before. There came a time that Gilbert went with Gibson to take the gaming system to a business called "CPR"; Gibson said the gaming system was broken.

{¶ 92} The state played surveillance-camera footage from the gas station located at the intersection of Wadena Avenue and Euclid Avenue. According to the time stamps on the recording, the recording captures the outside of the gas station during the following windows on October 10, 2018: 12:41–12:48 a.m., 7:40 a.m., 7:47 a.m., 8:10–8:16 a.m. and 8:29–8:34 a.m.

{¶ 93} The state played the portion of the recording captured between 12:41 and 12:48 a.m.[3] The recording shows a dark-colored vehicle pulling up to a gas pump; Gilbert identified the vehicle as Newberry's. Two people get out of the car; Gilbert identified one as Gibson and the other as Newberry. The person identified as Newberry exited the vehicle from the rear passenger door. The person identified as Gibson appears to interact with a gas station employee while the person identified as Newberry appears to walk around the outside of the gas station using a cell phone. Gibson gets back into the driver's seat of the vehicle and, a few minutes later, drives in reverse for a few feet. Newberry enters the rear passenger seat and the vehicle drives away from the station at 12:48 a.m.

{¶ 94} The state played the portions of the recording captured at 7:40 and 7:47 a.m. The recording shows a dark-colored vehicle driving through the station's lot and exiting the lot at 7:40 a.m.; Gilbert identified the vehicle as Newberry's. The recording shows a dark-colored vehicle pulling into the lot at 7:47 a.m.; Gilbert again identified it as Newberry's and said the car was traveling through the parking lot in the direction of Wadena Avenue.

{¶ 95} The state played the portion of the recording captured between 8:10 and 8:16 a.m. The video shows two people walking in the gas station's parking lot toward the station, appearing to come from the direction of Wadena Avenue. Gilbert identified them as Gibson and Sheeley. The person identified as Gibson appears to

---

[3] The recording is choppy, seeming to capture a frame every four seconds or so.

make a phone call at (according to the timestamp) 8:13 a.m.; Gilbert said this was around the time that Gibson called her to have her bring him a gas can. The men identified as Gibson and Sheeley then walk away from the station through the parking lot in the direction of Wadena Avenue.

{¶ 96} The state played the portion of the recording captured between 8:29 and 8:34 a.m. The recording shows two people walking in the gas station's parking lot toward the station, appearing to come from the direction of Wadena Avenue. Gilbert identified them as Gibson and Sheeley and identified that Gibson was holding the gas can she had dropped off to him at the abandoned house on Wadena. The two are seen outside the gas station, with Gibson leaving view of the camera for a time, until 8:34 a.m., at which time they exit the gas station through the parking lot in the direction of Wadena Avenue with the gas can.

{¶ 97} On cross-examination, Gilbert admitted that she did not see Newberry in the surveillance video recordings after 12:48 a.m. She admitted that she could not tell from the recordings who was driving Newberry's vehicle in the later recordings.

{¶ 98} Gilbert testified that she was texting with Gibson throughout the night of October 10, 2018, and said she was concerned for Gibson's safety. She testified that she understood Gibson was with Newberry and Sheeley that night.

{¶ 99} On cross-examination, Gilbert admitted that Gibson told her to bring the gas can because her car needed gas, which was a lie. She admitted that Gibson has lied to her in the past.

{¶ 100} Gilbert further admitted that she had criminal charges filed against her for lying to the Cleveland Heights Police Department with respect to a police chase in which Gibson had been involved. The incident occurred a couple weeks before October 10, 2018. She further admitted that those charges were dropped in exchange for her testimony against Newberry.

{¶ 101} Gilbert further admitted that she told police in November 2018 that when she got to Wadena Avenue with the gas can, she saw Gibson coming from Newberry's car (as opposed to standing outside the house, as she testified). She further admitted that she first told police that she had thrown away the videogame console (as opposed to taking it to CPR as she testified).

{¶ 102} On redirect, Gilbert said that she lied in that first interview because Gibson had been arrested the day before and she was concerned about him.

### 13. The Examination of Jacob Kunkle

{¶ 103} Jacob Kunkle testified that he is employed as a supervisory senior resident agent with the Federal Bureau of Investigation and is now in charge of the FBI's Canton and Mansfield offices. He said he is one of about 80 special agents nationwide that are assigned to the FBI's Cellular Analysis Survey Team for which he received specialized training in locating cell phones based on the records of cellular-communications providers. The state offered him as an expert in historical location analysis and the interpretation of cell-phone records; the defense did not object to his qualifications.

{¶ 104} Kunkle testified that communications providers record the date and time of communications that occur from a particular cell phone, the parties involved, the duration of the communication and the cell-phone tower used. The records further identify which side of a tower, which "sector," a communication used. "[I]f your phone makes or receives a communication," he explained, "it selects the strongest and clearest signal from one of those towers." Many times, that is the closest tower, but not always. In the Cleveland area, this information can locate a cell phone within, generally, a "few square mile area." He described this analysis as "a piece to the puzzle," one that cannot "precisely locate someone." He said the analysis "just gives you a general idea of where the phone was and whether it was in a particular area on a given date and time." He said that when he performs this analysis, many times he has "no knowledge of who possessed the phone on a given date or time." The analysis also does not identify the content of the communications.

{¶ 105} Kunkle analyzed call detail records from T-Mobile for cell-phone numbers associated with Gibson and Newberry, one ending in -1900 (Gibson's) and the other ending in -6116 (Newberry's), on October 10, 2018.

{¶ 106} Between 2 a.m. and 4 a.m., there was "quite a bit of activity" on the phone ending in -1900, "and that activity indicates that that phone moved from the East Cleveland area down into the Bedford area during that time period." There was only one call on the phone ending in -6116 in that time window; it was "down in the Shaker Heights area" at 2:21 a.m.

{¶ 107} Between 4 a.m. and 6 a.m., there were about 51 calls made to or from the phone ending in -1900 and the records "indicate that this particular phone was down in the Bedford area of Ohio" at that time. There was no activity noted from the phone ending in -6116, so the records provide no information about where that phone was during that window.

{¶ 108} Between 6 a.m. and 8 a.m., the -1900 number used a tower in Maple Heights and then moved into the East Cleveland area. There were two outgoing calls and one incoming call between 6:55 a.m. and 7:58 a.m. on the -6116 phone "which was up in the East Cleveland area." Both phones used the same side of the same tower for several calls between 6:55 a.m. and 7:58 a.m. on October 10, 2018.

{¶ 109} Between 8 a.m. and 8:30 a.m., both phones again used the same side of the same tower for communications, indicating that they were within the same several square-mile area in that window.

{¶ 110} On cross-examination, Special Agent Kunkle admitted that the list of phone towers he has from the service provider would not show which towers, if any, were not functioning — for maintenance or otherwise — on October 10, 2018. He also did not investigate what, if any, potential obstructions exist in the relevant areas that may have prevented a cell phone from connecting to the closest tower on October 10, 2018. He also did not know the range of the towers at issue.

14. **The Examination of Jennifer Bracamontes**

{¶ 111} Jennifer Bracamontes testified that she is employed as a DNA analyst at Cybergenetics and has been so employed for ten years and that she runs DNA data

through Cybergenetics' TrueAllele software, which performs DNA interpretation. The state offered her as an expert in DNA interpretation and the defense did not object to her qualifications. She testified to the following facts and conclusions relevant to this investigation.

{¶ 112} Cybergenetics' TrueAllele software "is a computer system that uses math and statistics and sampling to separate out contributors of DNA mixtures or samples that have more than one person present in them"; it is "one type of probabilistic genotyping software."

{¶ 113} On June 7, 2019, the medical examiner's office sent Cybergenetics the DNA data from the glove fragment found at Paul B.'s house, along with reference samples for the victims and suspects. After running the data through the TrueAllele software, it was determined that there were "two inclusionary match statistics." There was a match between the glove and Gibson, which was "16.5 octillion times more probable than a coincidence." There was also "a match between the glove and Mr. Newberry" which was "182,000 times more probable than a coincidence." Bracamontes explained that only one in 3.76 million people would match as strongly as Newberry did. She further explained that the software inferred that Gibson contributed around 85% of the DNA found in the sample and Newberry contributed around 6%; the remaining 9% was from an unknown person.

{¶ 114} On cross-examination, Bracamontes admitted that the TrueAllele software is only used in 10 of the nearly 400 crime laboratories in the country. She further admitted that Cybergenetics is a for-profit company that had collected

$8,500 from the prosecution for developing the reports in this case and would collect more as a result of her testimony at trial. Finally, she admitted that Cybergenetics does not have "any reporting thresholds" so it "report[s] whatever comes out" from the software's analysis of the data.

{¶ 115} On redirect, Bracamontes said the company would have had no problem reporting to the prosecutor's office if there had been support for excluding Newberry as a contributor to the DNA on the glove fragment.

### 15. The Examination of Dr. Joseph Felo

{¶ 116} Dr. Joseph Felo testified that he is employed as a forensic pathologist and the Chief Deputy Medical Examiner for Cuyahoga County. He said he has been employed as a forensic pathologist for over 24 years. The state offered him as an expert in forensic pathology and the defense stipulated to his qualifications. He testified to the following facts and conclusions relevant to this investigation.

{¶ 117} Dr. Andrea McCollom performed the autopsies on Paul and P.B. which Dr. Felo reviewed prior to trial.

{¶ 118} The cause of Paul B.'s death was determined to be "[b]lunt impact to head with brain injuries." Other conditions that contributed to the death were "[c]onflagration injury [flame burns] with thermal injuries and asphyxia by carbon monoxide." Dr. Felo described that the blunt injuries to Paul's head were severe, but are not always fatal. He described that the burns and asphyxia are not always fatal either. But "putting the two together, they're fatal." He summarized that the "blows to the head and the brain injuries" were the primary cause of Paul's death

"[a]nd what pushed him over the edge and finally caused his death is the burns and the carbon monoxide poisoning." The autopsy revealed that Paul was alive during the fire as he had breathed in smoke from the fire before death.

{¶ 119} The cause of P.B.'s death was determined to be "[g]unshot wounds of the head with skull and brain injuries." Specifically, the autopsy revealed that P.B. had been shot three times in the head and died before the fire started.

### 16. The Examination of Annette Kennedy

{¶ 120} Annettee Kennedy testified that she owns a used car lot in Cleveland called J&W Auto.

{¶ 121} Newberry was a customer of J&W Auto and had purchased "a couple cars" from the business. On September 21, 2018, Newberry bought a navy blue Ford Edge. He asked that the car be registered in his mother's name. Around three weeks later, Newberry returned the car because — he said — the radio was not working properly and "he just didn't want the car[;] [h]e wanted to be put into something else." Newberry had tinted the vehicle's windows, so he was told he would have to remove the tint before returning the car. Newberry had that work completed by the next day. Newberry purchased a light maroon Sonata on October 26, 2018, the same day Newberry turned in the Ford Edge; the car was also placed in his mother's name.

### 17. The Motions to Suppress Evidence and Dismiss the Indictment

{¶ 122} During trial, outside the presence of the jury, the defense moved to suppress a recording investigators had made of an interview they conducted with Newberry. The defense related that Newberry was represented by a lawyer who was

present at the interview. At the end of the recorded interview, the lawyer asked the detectives to turn off the recording. The detectives responded, "Give us five seconds" and left the room, leaving Newberry alone with counsel. The detectives did not turn off the recording equipment, which captured attorney–client communications between Newberry and his counsel.

{¶ 123} The defense argued that the recording should be suppressed and the indictment dismissed for what the defense viewed as an intentional violation of the attorney–client privilege.

{¶ 124} The trial court denied the motion to suppress and the motion to dismiss the indictment. It ordered that the portion of the recording containing the attorney–client communications be excluded from the exhibit that would be shown to the jury.

### 18. The Examination of Kenneth Lundy

{¶ 125} Kenneth Lundy testified that he is employed as a police captain with the East Cleveland Police Department but was a detective with the department in the fall of 2018.

{¶ 126} Lundy was assigned to the investigation of Paul's and P.B.'s deaths. In speaking with the victims' relatives, Lundy came to learn that two Playstation consoles, designer belts, watches and shoes had been stolen from the Gould Avenue residence, as were a "Louis Vuitton hat[] and a black and red JACK'S Casino duffle bag."

{¶ 127} Investigators received a tip that a "dark colored SUV" drove slowly past Paul B.'s Gould Avenue house at around 3 a.m. on October 10, 2018. The security camera at Harris' home later recorded Paul B.'s Buick LaCrosse driving in East Cleveland, followed closely by a dark-colored Ford Edge with a temporary tag. Investigators came to learn that Newberry had bought and returned a blue 2010 Ford Edge to J&W Auto; they towed the car from the lot to process it for evidence.

{¶ 128} Lundy interviewed Newberry on November 9, 2018. The state played the recording of the interview, during which Newberry claimed that a "Jamaican Shawn" had his car at the time of the murders.

{¶ 129} After making investigation, Lundy found that there was no merit "to the identification of Jamaican Shawn."

{¶ 130} Phone records showed that Gibson and Newberry were communicating by phone on October 9 and in "the early morning hours" of October 10, 2018. For instance, by comparing the time stamp on the gas station's surveillance recordings with the phone records, Lundy saw that Gibson's phone number was connected to Newberry's phone number in a call at around 8:31 a.m. on October 10 while Gibson was at the gas station holding the gas can Gilbert had brought him.

{¶ 131} The records also showed that Gibson's and Newberry's cell phones were "hitting off the same tower, so they're in the same area" at around 8:56 a.m. that morning.

{¶ 132} The records also showed that there were over 60 calls between Gibson and Gilbert in the "late night hours of October 9th into the early morning hours of October 10th * * *." Of those, 45 calls occurred between 4:20 a.m. and 5:30 a.m. on October 10.

{¶ 133} The records also showed that Newberry's phone number and Gibson's phone number were communicating on October 10 with a phone number associated with a Darriel Ray, whose grandmother owned the house next to the vacant lot where Paul's and P.B.'s bodies were found. Gibson's and Newberry's phone numbers were also communicating on October 10 with a phone number associated with an Antonio Bell, whose mother owned the "dump site" house on Wadena Avenue where investigators believe Paul and P.B. were taken before their deaths.

{¶ 134} The phone numbers associated with DeMarcus Sheeley and Quentin Palmer were also in contact with the phone numbers of Gibson and Newberry on October 9 and October 10.

{¶ 135} On cross-examination, Lundy admitted that Newberry voluntarily came to the East Cleveland Police Department on November 9, 2018, to turn himself in after police made it known that they wanted to talk to him as a person of interest.

{¶ 136} Lundy admitted that, in the interview, Newberry said he last saw his car at "one or two in the morning," which would have been after Newberry was seen with the car at the gas station. Lundy further admitted that Newberry exits his own car from the back seat in the camera footage; in the entire case, there are no

photographs of Newberry driving his car. Lundy further admitted that Newberry said he did not get his car and cell phone back until "somewhere before 12." Lundy admitted that Newberry does not appear on any of the gas-station security footage from later in the morning of October 10. He further admitted that he had previously identified — under oath — one of the people in those recordings as Newberry, but he had been mistaken.

{¶ 137} Lundy admitted that the burglary in Bedford could have occurred between 3 a.m. and 7 a.m. on October 10; it was not known when the gasoline was poured in the house and there was no video footage of whoever poured it in there.

{¶ 138} Lundy admitted that Newberry told investigators he did not have his cell phone during the relevant time period on October 10. No one saw Newberry talking on his phone during that time.

{¶ 139} He admitted that, while the FBI told him the phones used the same tower, he cannot tell how close those two phones were to each other.

{¶ 140} He admitted that no items identified as stolen from Paul B.'s Bedford home were found in Newberry's possession.

{¶ 141} Lundy admitted that law enforcement asked Newberry about "Jamaican Shawn" first, based on information they had obtained from someone else; Newberry did not volunteer that name to them. On redirect, Lundy said the first person to mention "Jamaican Shawn" to them was Newberry's mother.

## D. The Motion for Acquittal and the Defense Case

{¶ 142} After the close of the state's case, Newberry moved for acquittal on all the charges pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 143} The defense did not present a case. It renewed the motion for acquittal at the close of trial and the trial court denied the renewed motion.

## E. The Verdict

{¶ 144} On March 16, 2022, the jury returned its verdict. The jury found Newberry guilty on all counts with their attached specifications, except that it found that the state had not proven the firearm specifications attached to Counts 2, 5, 6 and 7. The trial court then took Count 15, which was tried to the bench, under consideration. The trial court found Newberry guilty of Count 15.

## F. The Sentence and Appeal

{¶ 145} The court held a sentencing hearing on March 24, 2022. The state addressed the court, as did several members of the Paul B. family. The court indicated that it had reviewed victim-impact letters received in the matter. The defense also addressed the court.

{¶ 146} As to each victim, the offenses of felonious assault, murder, aggravated arson and aggravated murder under R.C. 2903.01(B) were merged, at the state's election, into the offense of aggravated murder under R.C. 2903.01(A). In other words, Counts 3, 9, 10 and 11 merged into Count 1; Counts 4, 8, 12 and 13 merged into Count 2. The remaining offenses — the two kidnapping offenses (Counts 5 and 6), aggravated burglary (Count 7) and having weapons while under

disability (Count 15) — did not merge with any other offense. Newberry did not object to the trial court's merger decisions.

{¶ 147} The trial court sentenced Newberry to a term of life imprisonment with the possibility of parole after 30 years on each of Counts 1 and 2. The court imposed a three-year prison term for the firearm specification attached to Count 1, to be served prior and consecutive to the sentence for the underlying offense on Count 1. Newberry was sentenced to a term of 11 years for each of Counts 5, 6 and 7. Newberry was sentenced to a term of 2 years on Count 15. The trial court ran the sentences for Counts 1, 2 and 15 consecutively to each other. Newberry was granted jail-time credit in the amount of 1,222 days.

{¶ 148} Newberry appealed and raises twelve assignments of error for review:

Assignment of Error 1:

The trial court erred by not removing Juror 31 for cause.

Assignment of Error 2:

The trial court erred by admitting Newberry's recorded interview where law enforcement improperly recorded Newberry's privileged meeting with counsel.

Assignment of Error 3:

The trial court erred when it overruled Newberry's motion for a mistrial.

Assignment of Error 4:

Newberry was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

Assignment of Error 5:

The admission of testimony as to the content of unauthenticated records is plain error in violation of Newberry's Fifth, Sixth and Fourteenth Amendment rights.

Assignment of Error 6:

The trial court erred when it admitted hearsay evidence in violation of Newberry's confrontation rights.

Assignment of Error 7:

Improper identification testimony of police detectives — identifying Newberry as the person in a gas station surveillance video — invaded the province of the jury in violation of Newberry's rights.

Assignment of Error 8:

The trial court failed to inquire into the nature and extent of a conflict of interest arising out of defense counsel's representation of the lead police investigator.

Assignment of Error 9:

The trial court abused its discretion when it failed to disqualify defense counsel absent a knowing, intelligent and voluntary waiver.

Assignment of Error 10:

Newberry's convictions are against the manifest weight of the evidence.

Assignment of Error 11:

The state failed to present sufficient evidence to prove each and every element of the offenses beyond reasonable doubt.

Assignment of Error 12:

The cumulative effect of multiple errors deprived Newberry of his constitutionally guaranteed right to a fair trial under the federal and state constitutions.

## II. Law and Analysis

### A. First Assignment of Error – Juror No. 31

{¶ 149} Newberry contends that the trial court should have removed juror No. 31 for cause when the juror reported that his daughter, with whom he had not spoken for at least four years, was "friends with the victim's daughter." Because Newberry did not challenge juror No. 31 for cause during voir dire, we review this argument only for plain error. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 78.

{¶ 150} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court notices plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error "must be an 'obvious' defect in the trial proceedings" and we will not find plain error unless, but for the error, the outcome would have been different. *Barnes* at 27; *Long* at paragraph two of the syllabus; *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78. "The burden of demonstrating plain error is on the party asserting it." *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 151} Newberry has not demonstrated plain error. His argument seems to be premised on a presumption that is not supported by the record — that juror No.

31's daughter was friends with P.B., one of the victims. This is far from certain. Jennifer Heard testified that Paul had other children, including other daughters. The court read the indictment to the venire before voir dire began, so juror No. 31 knew that P.B. was one of the victims in the case. If the juror's daughter had been friends with P.B., one can presume that he would have said as much. The juror's use of the present tense "is friends" (as opposed to "was friends") and reference to "the victim's daughter" (as opposed to "one of the victims") strongly suggests that the juror's daughter is friends with another of Paul's children. But in any event, the juror reported that his daughter's friendship with one of Paul's children would not affect the juror's ability to be fair and impartial. Based upon a review of the entire voir dire, we see no obvious error in the trial court seating juror No. 31 on the jury.

{¶ 152} Newberry further contends that his trial counsel was ineffective for failing to challenge juror No. 31 for cause.

{¶ 153} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *See id.* at 687.

{¶ 154} In evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance

and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Powlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 155} As it relates to counsel's performance in voir dire, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001). Newberry must demonstrate that counsel's performance was objectively unreasonable in light of counsel's failure to further question or strike the juror at issue. *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 25. To establish prejudice, Newberry "'must show that [a] juror was actually biased against him.'" (Emphasis omitted; alteration in original.) *Id.*, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67.

{¶ 156} There is no indication that juror No. 31 was biased against Newberry. We do not view it as objectively unreasonable that counsel did not question the juror further or move to strike the juror. The fact that the juror's daughter is friends with one of the victim's children is not, standing alone, one of the enumerated bases upon which a juror may be challenged for cause under R.C. 2313.17. Moreover, the juror reported that he had not spoken with his daughter for years prior to trial. Finally, the juror stated under oath that the relationship would

not affect his ability to be fair and impartial in the matter. Under the facts and circumstances of this case, we do not find that Newberry's counsel was ineffective with respect to the seating of juror No. 31 on the jury.

### B. Second Assignment of Error – Recorded Interview of Newberry

{¶ 157} Newberry contends that the trial court erred by admitting a video recording of an interview of Newberry with police investigators. The original recording captured Newberry consulting privately with defense counsel but the version the state offered at trial had that portion of the recording removed. Newberry argued that the fact that the state had recorded that conversation in the first place violated his Sixth Amendment rights and, therefore, the entire recording should have been excluded or the indictment dismissed. The trial court allowed the remainder of the recording — which, again, did not include the attorney–client conversation — to be admitted and played to the jury.

{¶ 158} "'Implicit within the meaning of [the constitutional right to counsel] is the right of a criminal defendant to consult privately with his attorney.'" (Alterations in original.) *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 131, quoting *State v. Milligan*, 40 Ohio St.3d 341, 342, 533 N.E.2d 724 (1988). But "'[e]ven where there is an intentional intrusion by the government into the attorney–client relationship, prejudice to the defendant must be shown before any remedy is granted.'" *Osie* at ¶ 144, quoting *United States v. Steele*, 727 F.2d 580, 586 (6th Cir.1984).

{¶ 159} To determine prejudice, a court must look to the factors identified in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977): (1) whether the government deliberately intruded in order to obtain confidential and privileged information, (2) whether the government obtained directly or indirectly any evidence which was or could be used at trial as a result of the intrusion, (3) whether any information obtained was or could be used in any manner detrimental to the defendant and (4) whether details about trial preparation were learned by the government. *Osie* at ¶ 144, citing *Milligan* at 344.

{¶ 160} Here, none of those four factors are present. We find, however, that it was an unconscionable violation of Newberry's constitutional rights. There is not, however, anything in the record that suggests the government obtained information that it used or could have used at trial or in another way detrimental to Newberry. Finally, there is nothing in the record suggesting that the government learned any details about defense trial preparation from the act.

{¶ 161} Therefore, the defense did not demonstrate that they were entitled to any remedy beyond that taken by the trial court, redacting the confidential conversation from the recording played at trial.

**C. Third Assignment of Error – Newberry's Motion for a Mistrial**

{¶ 162} Newberry contends that the trial court erred by not ordering a mistrial during Lundy's testimony after the following exchange:

> [PROSECUTING ATTORNEY]: During the interview [Newberry gave with police investigators], the defendant stated he was going to provide you with a list of names and alibi witnesses. * * * Was that ever provided?

[LUNDY]: No.

{¶ 163} Newberry says that this exchange implied that Newberry had an affirmative duty to provide a list of alibi witnesses to the police, undermining the presumption of innocence "and effectively reallocat[ing] the burden to the defense to disprove the State's case" in violation of the Fifth Amendment.

{¶ 164} The decision to grant or deny a motion for mistrial lies within the sound discretion of the trial court. *State v. Taylor*, 8th Dist. Cuyahoga No. 111694, 2023-Ohio-928, ¶ 38; *State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168, 656 N.E.2d 623 (1995). This is "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his [or her] courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988).

{¶ 165} A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *See, e.g.*, *State v. Musleh*, 8th Dist. Cuyahoga No. 105305, 2017-Ohio-8166, ¶ 36, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "An abuse of discretion also occurs when a court '"applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact."'" *Cleveland v. Wanton*, 8th Dist. Cuyahoga No. 109828, 2021-

Ohio-1951, ¶ 8, quoting *S. Euclid v. Datillo*, 2020-Ohio-4999, 160 N.E.3d 813, ¶ 8 (8th Dist.), quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶ 166} "'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 110883, 2022-Ohio-1940, ¶ 31, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 550 N.E.2d 490 (2d Dist.1988), paragraph two of the syllabus. A mistrial is warranted only when "'the ends of justice so require and a fair trial is no longer possible.'" *Taylor* at ¶ 38, quoting *Garner* at 59.

{¶ 167} After a thorough review of the record, we conclude that the trial court acted within its discretion by denying Newberry's motion.

{¶ 168} "It is axiomatic that in a criminal prosecution, the prosecution bears the burden of proof in demonstrating that the accused is guilty beyond a reasonable doubt. Further, the prosecution may not shift to the accused the burden of proof on an essential element of the crime." (Citation omitted.) *State v. Porter*, 2016-Ohio-1115, 61 N.E.3d 589, ¶ 58 (8th Dist.), citing R.C. 2901.05(A) and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

{¶ 169} Here, though, the context of the state's question makes clear that the state was clarifying for the jury that it did not fail to investigate Newberry's explanation for his whereabouts on the date of the murders. The investigators were never provided the name of any witness to interview regarding Newberry's alibi. The

state did not comment on Newberry's failure to produce alibi witnesses during closing argument.

{¶ 170} Moreover, the jury was instructed that the state bore the burden of proof and that the defense had no burden. A jury is presumed to follow the instructions, including curative instructions, given to it by a trial judge. *Garner* at 59.

{¶ 171} Given the context of the prosecutor's question and the instructions of the trial court clarifying that the state bore the burden of proof, we cannot say that the trial court abused its discretion in denying Newberry's motion for a mistrial.

### D. Fourth and Fifth Assignments of Error – Cell Phone Records and Ineffective Assistance of Counsel

{¶ 172} We consider Newberry's fourth and fifth assignments of error together because they are intertwined. Through them, Newberry challenges the admission into evidence of cell phone records containing location data for Newberry's and Gibson's cell phones. He contends that (1) the trial court erred by admitting the records because the records were not properly authenticated and (2) he was denied the effective assistance of counsel at trial because defense counsel did not object to the evidence on *Daubert* grounds and based on the lack of authentication.

### 1. The Cell Phone Records Were Authenticated

{¶ 173} Because Newberry failed to object to the admission of the cell phone records at trial, he has forfeited all but plain error as to his authenticity argument.

{¶ 174} Newberry contends that the records provided by the cell-phone companies were never authenticated or qualified as business records pursuant to Evid.R. 901 or 803(6). He argues that they should have been excluded, citing *State v. Brooks*, 5th Dist. Richland No. 2011-CA-59, 2012-Ohio-1725, and *State v. Hood*, 134 Ohio St.3d 595, 2012-Ohio-5559, 984 N.E.2d 929.[4] He says that the error was not harmless considering the circumstantial nature of the state's case.

{¶ 175} The state responds that the records were properly authenticated because Lundy testified that he received the records from T-Mobile in response to a search warrant and the records were accompanied by a statement from T-Mobile confirming that fact. The state directs us to *Chagrin Falls v. Ptak*, 8th Dist. Cuyahoga No. 109342, 2020-Ohio-5623; *State v. Richardson* 2016-Ohio-8081, 75 N.E.3d 831 (2d Dist.) and *Brecksville v. Sadaghiani*, 8th Dist. Cuyahoga No. 109992, 2021-Ohio-2443.

{¶ 176} Evid.R. 901(A) addresses the authentication or identification of evidence prior to its admissibility. Evid.R. 901(A) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is a "'a low threshold.'" *State v. Rogers*, 8th Dist. Cuyahoga No. 105879, 2018-Ohio-3495, ¶ 15, quoting *State v. Maust*, 8th Dist.

---

[4] The Ohio Supreme Court vacated its decision in *State v. Hood*, 134 Ohio St.3d 595, 2012-Ohio-5559, 984 N.E.2d 929, and replaced it with a reconsidered opinion at *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. Thus, we discuss the reconsidered opinion below.

Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 24. It "'does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be.'" *Rogers* at ¶ 15, quoting *Maust* at ¶ 24. The proponent of the evidence must demonstrate a "'reasonable likelihood' that the evidence is authentic, which may be supplied by the testimony of a witness with knowledge." *State v. Roseberry*, 197 Ohio App.3d 256, 268, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 65 (8th Dist.), quoting *State v. Bell*, 12th Dist. Clermont No. CA2008-05-044, 2009-Ohio-2335, ¶ 30; *State v. Wright*, Dist. Clermont No. 28831, 2021-Ohio-2133, at ¶ 77.

{¶ 177} In the context of a business record, a "'qualified witness' * * * would be someone with 'enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.'" *Hood*, 135 Ohio St.3d 137 at ¶ 40, quoting 5 McLaughlin, *Weinstein's Federal Evidence*, Section 803.08[8][a] (2d Ed.2009).

{¶ 178} Here, Lundy testified that the cell-phone records were obtained directly from T-Mobile through a court-issued search warrant. The records were admitted into evidence along with a statement from T-Mobile that the records were being produced "in response to the Search Warrant * * * dated November 05, 2018."

{¶ 179} Moreover, the state presented the testimony of Jacob Kunkle, an FBI special agent who received specialized training in locating cell phones based on the records of cellular-communications providers. He is one of only approximately 80 special agents in the country on the FBI's Cellular Analysis Survey Team. To qualify

for that specialized team, Kunkle underwent 400 hours of training with various cellular-communications providers, learning from the providers' records custodians and radio engineers. After that training, Kunkle passed a practical examination on the subject. He has performed thousands of location analyses in his career.

{¶ 180} Kunkle testified in detail about how communications providers record data about communications that occur from a particular cell phone, identifying the cell-phone tower and sector used. He explained how this data is used to locate a cell phone within an area as large as several square miles. He described the limitations of the technology, too, noting that a cell phone does not always select the closest tower when making a communication connection. He frankly admitted that the analysis was only "a piece to the puzzle" and that one cannot "precisely locate someone" using the providers' location data. He said the analysis "just gives you a general idea of where the phone was and whether it was in a particular area on a given date and time." Moreover, he admitted that he has "no knowledge of who possessed the phone on a given date or time" and that the analysis does not identify the content of any communications.

{¶ 181} We find that Agent Kunkle is sufficiently familiar with the record-keeping system of T-Mobile to be a qualified witness for purposes of Evid.R. 803(6). *See State v. Johnson*, 2022-Ohio-4344, 203 N.E.3d 78, ¶ 104–108 (5th Dist.). This testimony, when combined with Lundy's testimony that the records were obtained from T-Mobile through a search warrant and the statement in the records confirming that the records were produced pursuant to the warrant, was sufficient

to overcome the low threshold of authentication. *See Chagrin Falls v. Ptak*, 8th Dist. Cuyahoga No. 109342, 2020-Ohio-5623, ¶ 21.

### 2. Trial Counsel Was Not Ineffective

{¶ 182} "Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *Id.*

{¶ 183} Newberry contends that his defense counsel should have challenged the reliability of the cell phone records' location data pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). He further argues that his counsel should have objected to the records' admission because of a lack of foundation.

{¶ 184} In *Daubert*, the United States Supreme Court held that the trial court must act as a "gatekeeper" to ensure both the relevancy and reliability of expert scientific testimony before admitting it. The Ohio Supreme Court adopted the *Daubert* approach to determining the reliability of expert scientific testimony in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998).

{¶ 185} This court has previously held, however, that "testimony concerning a defendant's cell phone records and the location of the cellular towers used by a defendant's phone in relation to locations relevant to the crime constitutes lay opinion testimony that does not require 'specialized knowledge, skill, experience,

training, or education' regarding cellular networks." *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, ¶ 30, citing *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 69 (8th Dist.). We further noted that a *Daubert* analysis would be appropriate to the extent that a witness exceeded simply detailing the defendant's phone records and which cellular towers were used. *Wilson* at ¶ 31.

{¶ 186} Because Agent Kunkle only testified about the cell phone records of Gibson and Newberry and the location of the cellular towers used by their phones in relation to the locations relevant to the crimes, his testimony was admissible as lay testimony and Newberry has failed to demonstrate prejudice. We find that trial counsel's decision not to challenge the evidence was a tactical decision and the product of trial strategy. *See also State v. Sands*, 11th Dist. Lake No. 2007-L-003, 2008-Ohio-6981, ¶ 108 (noting that the decision to raise a *Daubert* challenge is a matter of trial strategy).

**E. Sixth Assignment of Error – Hearsay Evidence and the Confrontation Clause**

{¶ 187} Newberry contends that the trial court erred in admitting, over objection, Quiana Gilbert's statement that it was her understanding that Gibson was with Newberry overnight on the night of the murders.

{¶ 188} The Sixth Amendment to the U.S. Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against [the accused]." The United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to

testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶ 189} Here, though, there is no out-of-court testimonial statement. Quiana Gilbert testified that it was her understanding that Gibson was with Newberry throughout the night of the crimes. It was established that Gilbert was communicating with Gibson over the phone that night. But the state did not elicit testimony from Gilbert that Gibson told her that he was with Newberry.

{¶ 190} Because Gilbert did not testify about what Gibson told her on the phone that evening, there is no out-of-court statement that could be considered hearsay and there is no Confrontation Clause issue.

## F. Seventh Assignment of Error – Identification Testimony

{¶ 191} Newberry contends that the trial court erred by admitting Captain Lundy's testimony identifying Newberry as one of the individuals captured by gas station security cameras on the night of the shooting. He further argues that his counsel was ineffective for failing to object to the identification testimony.

{¶ 192} Lundy identified Newberry in security-camera footage captured between 12:41 a.m. and 12:48 a.m. on the day of the murders. Gilbert also identified Newberry in that footage.

{¶ 193} In Gibson's trial, Lundy mistakenly identified Newberry in recordings captured later that morning. But, contrary to what Newberry suggests, Lundy did not make the same mistake in Newberry's trial. To the contrary, Lundy

admitted that Newberry does not appear on any of the gas-station security footage from later in the morning of October 10. He further admitted that he had previously identified, under oath, one of the people in those recordings as Newberry, and that he had been mistaken.

{¶ 194} Lundy was familiar with Newberry because he participated in Newberry's interview. Moreover, Gilbert also identified Newberry in the recordings.

{¶ 195} There is no merit to Newberry's seventh assignment of error.

### G. Eighth and Ninth Assignments of Error – Counsel's Alleged Conflict of Interest

{¶ 196} We address Newberry's eighth and ninth assignment of error together because they are intertwined. Through them, Newberry contends that one of his defense counsel had a conflict of interest based on counsel's former representation of Marché and other East Cleveland law-enforcement officers. He asserts that his counsel should have been disqualified from representing him at trial.

{¶ 197} "The fundamental right to counsel includes a 'correlative right to representation free from conflicts of interest.'" *State v. Williams*, 166 Ohio St.3d 159, 2021-Ohio-3152, 184 N.E.3d 29, ¶ 6, quoting *State v. Gillard*, 64 Ohio St.3d 304, 311, 595 N.E.2d 878 (1992). "'Both defense counsel and the trial court are under an affirmative duty to ensure that a defendant's representation is conflict-free.'" *Williams* at ¶ 6, quoting *State v. Dillon*, 74 Ohio St.3d 166, 167–168, 1995-Ohio-169, 657 N.E.2d 273 (1995).

{¶ 198} Here, the nature of defense counsel's former representation of one of the state witnesses was fully disclosed, defense counsel stated that the former

representation presented no conflict of interest and the trial court asked Newberry if he was comfortable proceeding to trial with that counsel. Newberry said that he was.

{¶ 199} Newberry has not shown that this consent was anything but informed and voluntary. Further, he has not shown that counsel's former representation presented an actual conflict of interest or that counsel's performance was adversely affected by the previous representation. *See Williams at* ¶ 8.

{¶ 200} Appellant's eighth and ninth assignments of error are without merit.

## H. Tenth and Eleventh Assignments of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 201} We address Newberry's tenth and eleventh assignments of error together. Newberry contends that the state did not present sufficient evidence with respect to any count for which he was found guilty and he says that the trial court should, therefore, have granted his Crim.R. 29(A) motion for acquittal on each count. He further contends that his convictions were against the manifest weight of the evidence.

{¶ 202} While Newberry challenges every count for which he was found guilty, any error with respect to the sufficiency or manifest weight of the evidence on the felonious-assault, murder, aggravated-arson and aggravated-murder-under-R.C. 2903.01(B) counts is harmless beyond a reasonable doubt because those counts were merged into aggravated murder under R.C. 2901.01(A) at sentencing. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 ("When

counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *."), citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

{¶ 203} Therefore, in addressing these assignments of error, we consider only whether the convictions for aggravated murder under R.C. 2901.03(A), kidnapping, aggravated burglary and having weapons under disability were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 204} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 205} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a

determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime."). We must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 206} A manifest-weight challenge, on the other hand, attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *See State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 207} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest-weight

grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 208} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g.*, *State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 209} A person commits aggravated murder under R.C. 2903.01(A) by purposely causing the death of another with prior calculation and design. R.C. 2903.01(A). "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978).

{¶ 210} A person commits kidnapping under R.C. 2905.01(A)(3) by, through force, threat or deception, removing another person from the place where the other person is found or by restraining the liberty of that person, for the purpose of terrorizing or inflicting serious physical harm to anyone. R.C. 2905.01(A)(3).

{¶ 211} A person commits aggravated burglary under R.C. 2911.11(A)(1) by trespassing, by force, stealth or deception, in an occupied structure while someone is present in the structure with the purpose to commit in the structure any criminal

offense where the offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 212} A person commits the crime of having weapons while under disability by knowingly acquiring, having, carrying or using any firearm if the person has been convicted of certain felony offenses. R.C. 2923.13(A)(3). In order to "have" a firearm, an individual must either actually or constructively possess it. *E.g.*, *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 16.

{¶ 213} Here, the fact that these crimes were committed is not in dispute. Newberry instead argues that the state did not offer sufficient evidence to prove beyond a reasonable doubt that he committed those crimes or was complicit in their commission. Our court has held that a person who aids and abets a principal offender in the commission of a crime constructively possesses a firearm possessed solely by the principal offender. *See, e.g.*, *Adams* at ¶ 19 (collecting cases); *but see State v. Lewis*, 2d Dist. Greene No. 96CA12, 1997 Ohio App. LEXIS 1316 (Apr. 4, 1997).

{¶ 214} Ohio's complicity statute, R.C. 2923.03, states as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

{¶ 215} To "aid or abet" is to "'assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 26, quoting *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). R.C. 2923.03(F) provides that a person who violates the complicity statute "shall be prosecuted and punished as if he were the principal offender."

{¶ 216} As the Ohio Supreme Court recently described:

"To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson* at syllabus. "'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

*McFarland* at ¶ 29.

{¶ 217} The question here, then, is whether there was sufficient evidence presented for a rational trier of fact to find beyond a reasonable doubt that Newberry committed or was complicit in the crimes committed against Paul and P.B.

{¶ 218} While the state's case was admittedly circumstantial, we find that there was sufficient evidence to support Newberry's convictions based on his participation or complicity in the scheme to rob, kidnap and murder Paul and P.B.

{¶ 219} Newberry associated with Gibson and Sheeley in the summer and into the fall of 2018. Three weeks before the murders, Newberry purchased the dark blue Ford Edge that would be used throughout these crimes. He directed that the

car be registered in someone else's name and he caused the windows of the vehicle to be tinted. Newberry returned the vehicle to the dealership less than three weeks after the murders. The car had been detailed before it was returned, rendering certain forensic tests futile. In light of the other evidence in the case, a rational trier of fact could conclude that Newberry procured, altered, cleaned and returned the car in the ways he did to assist in the commission of the robbery–murder scheme.

{¶ 220} The evidence supports a conclusion that Newberry was involved in the scheme in other ways, too. Newberry and Sheeley were with Gibson at around 3 p.m. on October 9, 2018, the day before the murders, driving Gilbert to work. Newberry was captured on surveillance footage entering his Ford Edge at a gas station near to the presumed murder scene, with Gibson, at 12:48 a.m. on October 10, 2018. The two leave the parking lot in the vehicle, together.

{¶ 221} Gibson's phone moved from East Cleveland to Bedford between 2 a.m. and 4 a.m.; a witness described seeing a dark-colored vehicle driving slowly past Paul B.'s home in the early morning hours of October 10. Gibson's phone is in Bedford between 4 a.m. and 6 a.m. While Newberry's phone shows no activity during this time, DNA collected from an examination glove in Paul B.'s home matched Newberry's DNA; a match was 182,000 times more probable than a coincidence. When Newberry's car was swabbed later, there was positive match support found for P.B.'s DNA in the rear seat on the armrest. Swabs taken from the car also tested positive for gasoline and a medium petroleum distillate, the same

kind of accelerants that were found spilled throughout Paul B.'s home. Items of value from Paul's home had been stolen and were later seen in Gibson's possession.

{¶ 222} Between 6 a.m. and 8 a.m., Gibson's phone moved into the East Cleveland area. When Newberry's phone next pinged off a cell tower at 6:55 a.m., it was in the East Cleveland area. Between that time and 8:30 a.m., Newberry's and Gibson's phones used the same side of the same cell tower, indicating that they were in the same general area at the same time. Newberry's car is seen on the gas station surveillance video at 7:40 a.m. and 7:47 a.m. At the latter time, the vehicle is traveling through the parking lot in the direction of Wadena Avenue. Newberry's car is seen on surveillance from a home on Wadena Avenue, traveling with Paul's rental car.

{¶ 223} Gibson is seen on surveillance footage bringing the gas can from the direction of Wadena Avenue to the gas station. He is recorded making a phone call from the gas station, and records show that he was talking with Newberry's phone. Gibson then exits the gas station, walking in the direction of Wadena Avenue and the vacant lot where Paul's burning car would be found later that morning. P.B. had been shot to death and Paul had been struck on the head and then burned alive.

{¶ 224} When Newberry was interviewed by police, he claimed that a "Jamaican Shawn" had his car and phone that entire night. Police later determined that no such person exists.

{¶ 225} These facts support the inference that Newberry was "more than a mere bystander" in these crimes. *See State v. High*, 2018-Ohio-2236, 115 N.E.3d

702, ¶ 34 (8th Dist.); *State v. Riley*, 8th Dist. Cuyahoga No. 107073, 2019-Ohio-981, ¶ 46.

**{¶ 226}** This evidence is sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that Newberry either committed or assisted and facilitated these offenses.

**{¶ 227}** As to manifest weight, Newberry points to no inconsistencies in the evidence. He only argues that the evidence against him was "of such low credibility and reliability that it undermines [the] reliability of the outcome of the trial." After a careful review of the record, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.

## I.  Twelfth Assignment of Error – Cumulative Errors

**{¶ 228}** Newberry contends that the alleged errors  he identified in his first eleven assignments of error cumulatively deprived him of his constitutional right to a fair trial.

**{¶ 229}** Pursuant to the doctrine of cumulative error, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial-court error does not individually constitute cause for reversal. *State v. Baker*, 8th Dist. Cuyahoga No. 95300, 2011-Ohio-2784, ¶ 59, citing *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995).

{¶ 230} In order to find cumulative error present, we must find that multiple errors were committed at trial. We must then find a reasonable probability that the outcome of the trial could have been different but for the combination of the separately harmless errors. *State v. Djuric*, 8th Dist. Cuyahoga No. 87745, 2007-Ohio-413, ¶ 52. To affirm in spite of multiple errors, we would have to determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. *State v. Williams*, 8th Dist. Cuyahoga No. 94261, 2011-Ohio-591, ¶ 25, citing *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987) (stating that the errors can be considered harmless if there is overwhelming evidence of guilt of other indicia that the errors did not contribute to the conviction).

{¶ 231} Here, Newberry merely references the arguments addressed in his first eleven assignments of error. As discussed above, we have found no errors in the trial. We, therefore, overrule Newberry's twelfth assignment of error.

## III. Conclusion

{¶ 232} Having overruled Newberry's assignments of error for the reasons stated above, we affirm.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

The defendant's conviction having been affirmed, any bail pending is terminated.

Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR