[Cite as *State v. Harris*, 2024-Ohio-961.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                                                  No. 112195

    v. :

DEANDRE HARRIS, :

    Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 14, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-646006-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrew F. Rogalski and Nora C. Bryan, Assistant Prosecuting Attorneys, *for appellee*.

Mary Catherine Corrigan, *for appellant*.

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Deandre Harris, appeals the conviction for having weapons while under disability following a bench trial. For the reasons that follow, we affirm.

## I.  Factual Background and Procedural History

{¶ 2} On December 10, 2019, a Cuyahoga County Grand Jury indicted Deandre Harris and a codefendant — Kielonte Harris[1] — on charges including aggravated murder, aggravated burglary, aggravated robbery, kidnapping and felonious assault.  Deandre was also indicted on two counts of having weapons while under disability.  The charges stemmed from an investigation into the shooting deaths of April Magana, Joseph Meeks and Muriel Tursivio at 7802 Lorain Avenue in Cleveland on November 2, 2019.

{¶ 3} The state's theory was that Kielonte Harris shot Magana, Meeks and Tursivio that night, killing them.  The state believed that Deandre was present for each of the murders and aided and abetted Kielonte in several ways, including by holding a witness by her hair during the argument that led to the shooting.  The state further argued that Deandre possessed a firearm that night, despite having a previous conviction that prohibited him from doing so.

{¶ 4} The defense argued that the state's evidence established, at best, that Deandre was in the vicinity of Kielonte at the time of the murders and witnessed the killings.

{¶ 5} Trial on the charges commenced on October 19, 2022.  Deandre elected to have the trial court serve as factfinder on the having weapons while under

---

[1] Kielonte Harris' companion case in the common pleas court is Cuyahoga C.P. No. CR-19-646006-B.  His companion appeal is *State v. Kielonte Harris*, 8th Dist. Cuyahoga No. 112269.

disability charges; the remaining charges were tried to a jury. The state's case unfolded over nearly two weeks and consisted of the testimony of 22 witnesses.

{¶ 6} At the close of the state's case in chief, the trial court granted Deandre Harris' Crim.R. 29 motion for acquittal on all charges except for two counts of having weapons while under disability with attached firearm specifications. Therefore, we limit our discussion of the evidence to that which is relevant to the trial court's findings of guilt on the two counts of having weapons while under disability.

## A. The Examination of Bethani Rollins

{¶ 7} Bethani Rollins testified that in November 2019 she lived in the same apartment building as April Magana, in the apartment located next door to April. Bethani lived with her husband, Joseph Rollins and their son.

{¶ 8} Bethani was awakened at 3:53 a.m. on November 2, 2019 by the sound of arguing coming from April's apartment. She could not tell what the argument was about, but she heard "multiple people"; it sounded like "maybe three or four" people, a combination of male and female voices. About a minute after she woke up, she heard a single gunshot. She then heard a scream and a woman began crying. Bethani woke Joseph, who was sleeping in another room. Bethani and Joseph then heard yelling outside the apartment building. Bethani identified one voice, that of a person she knew as "Red." Other evidence in the trial identified "Red" as Joseph Meeks.

{¶ 9} "Red" yelled, "Don't kill me, please don't kill me." Bethani then called 911. She heard two additional gunshots after she heard "Red" yelling outside.

{¶ 10} On cross-examination, Bethani admitted that she did not know what Magana did for a living. There were a number of people coming and going from Magana's apartment on a regular basis. Bethani knew her neighborhood to be "a bit rough"; she had seen prostitution and drug dealing in the area.

**B. The Examination of Joseph Rollins**

{¶ 11} At the time of the murders, Magana was living with a man known as "Blue." Another couple was also living in Magana's apartment; they had been living there for about a month before the incident. Joseph knew this couple by the names "Dutch" and "Erica." Other evidence in the trial identified "Dutch" as Weaver Jones and "Erica" as Erica Vaultman.

{¶ 12} Joseph had seen a man known as "Red" around the apartment building but testified that he and "Red" did not interact frequently.

{¶ 13} On the night of the shootings, Bethani woke Joseph up and told him that she thought someone had been shot. At first, Joseph did not hear anything coming from the other apartment except "somebody talking and then maybe a little bit of crying." Joseph went into another room and, from there, heard a person going down the back steps of the apartment building. Joseph heard the person say, "Please don't shoot me, please don't shoot me." From the window, Joseph could see people walking down the back steps. Joseph told Bethani to call the police. Then Joseph heard a gunshot and looked out a window; he saw "Red" "laying in the street."

Joseph also saw "one guy, just average-looking guy, like real quick though." Joseph could not see what this male was doing and could not identify him, although he could tell the person was not "Dutch" or "Erica." Joseph was not at the window long; he began barricading his apartment doors to protect his family.

### C. The Examination of Melissa Lyons

{¶ 14} Melissa Lyons testified that she went to Magana's apartment in the early morning hours on November 2, 2019. She went to the apartment to "say hi to her for a second" and to purchase drugs from a person she knew as "Dutch," who she knew to be living at Magana's apartment. There was a party going on at the apartment and Lyons saw individuals she knew as Magana, "Dutch," "Erica" and "Casey" inside when she arrived.

{¶ 15} Lyons used the restroom in the apartment. While she was in the restroom, she heard a knock at the back door, followed by a man's voice from the same area. She heard a "brief" argument, during which the man asked "where his money was at." She heard Magana say something "like she had been doing this since 1990 something." While it sounded like they may have been "joking around," Lyons heard a gunshot seconds later. She estimated that it was less than a minute that they were arguing before she heard the gunshot.

{¶ 16} She left the bathroom and heard people running down the outside stairs. She saw Magana at a table in the apartment, with a gunshot wound in her head. Lyons ran down the outside stairs. At that time, she heard a male voice yell

"take them all out." Seconds later, as Lyons was running away, she heard more gunshots.

{¶ 17} She ran to a security guard at a nearby bar to ask for help. When she returned to the area of the shooting, she saw "Red" lying dead in the street.

### D. The Examinations of Lance Estergall, Gregory Hyde and Daniel Florentz

{¶ 18} Lance Estergall and Daniel Florentz testified that they are employed by the Cleveland Police Department and were working as patrol officers on November 2, 2019. Gregory Hyde testified that he is employed as a Cleveland paramedic and was working in that role on November 2, 2019. In the early morning that day, each of the three men responded to an apartment building located at the intersection of West 78th Street and Lorain Avenue in reference to reports of a shooting.

{¶ 19} When Estergall arrived on scene, he saw a male lying in the street, apparently deceased. Hyde testified that, when he arrived on scene as a paramedic, officers directed him to a male who was lying in an alleyway. Hyde examined the man and pronounced him dead. Other evidence in the trial established that this victim was "Red" — Joseph Meeks.

{¶ 20} Estergall and other officers made their way to a second-floor apartment in the building, where officers located a woman who also appeared to be deceased. Florentz assisted in clearing the second-floor apartment. Florentz described that he saw one female victim in the apartment, who was obviously deceased with a gunshot wound; there were "drugs" around the victim. Other

evidence in the trial established that this victim was April Magana and that she was killed in her own apartment.

{¶ 21} Estergall related that at some point while securing the scene, officers discovered a second woman who had been shot outside the apartment. Hyde testified that police officers directed him to a female who "was in the back parking lot area" behind the apartment building; she was between "some boat trailers." Hyde examined the woman. The woman had a gunshot wound to the head and was "not responsive to anything but pain." She was breathing but was not moving one side of her body. Paramedics transported her to the hospital; she was alive when they arrived at the hospital. Other evidence established that this victim was Muriel Tursivio. Estergall testified that Tursivio passed away at the hospital.

{¶ 22} On cross-examination, Estergall admitted that there was a large group of people outside the apartment building but no one reported seeing what happened.

### E. The Examination of Dr. Thomas Gilson

{¶ 23} Dr. Thomas Gilson testified that he is a forensic pathologist and is employed as the medical examiner for Cuyahoga County. Deandre Harris stipulated to Dr. Gilson's qualifications and the court accepted him as an expert. Dr. Gilson conducted the death investigations into the deaths of April Magana, Joseph Meeks and Muriel Tursivio.

{¶ 24} April Magana was found deceased in her second-floor apartment with her head resting on a table. It appeared on scene that she had a gunshot wound

to the head. There was a plastic baggy containing white powder in her left hand. After an autopsy, Dr. Gilson confirmed that Magana had been shot in the right temple, causing injuries to her brain and skull and killing her. The gun was probably between 1.5 and 2.0 feet from Magana when she was shot.

{¶ 25} It also appeared, on scene, that Joseph Meeks had a gunshot wound to the head. After autopsy, Dr. Gilson confirmed that Meeks had been shot in the left temple area, causing injuries to his brain and skull and killing him.

{¶ 26} Muriel Tursivio was transported from the scene to a hospital by emergency medical providers. Tursivio passed away a few hours after she arrived at the hospital. After autopsy, Dr. Gilson concluded that Tursivio was shot in the left eye, causing injuries to her brain and skull and killing her.

{¶ 27} On cross-examination, Dr. Gilson admitted that toxicology testing revealed that Magana, Meeks and Tursivio had all been under the influence of cocaine when they died.

### F. The Examinations of Todd Clemens and Kristen Koeth

{¶ 28} Todd Clemens testified that he is employed as a Cleveland police officer and was a crime-scene detective on November 2, 2019. He took photographs and collected evidence from the Lorain Avenue crime scene that morning, collecting a bullet cartridge and three cartridge cases, among other things. He also collected other pieces of evidence, including a cigar tip, a lighter, pieces of loose change and a glove.

{¶ 29} Kristen Koeth testified that she is employed as a firearm and tool mark examiner in the firearms section of the forensics laboratory. Koeth described her training and experience and the court accepted her as an expert in the field of firearm and tool mark examinations

{¶ 30} Koeth examined the three 9 mm cartridge cases recovered from the crime scene on Lorain Avenue. Based on her examination, she concluded that all the cartridge cases were fired from the same 9 mm firearm.

{¶ 31} Koeth also examined the live round recovered from Magana's apartment, an unfired Federal Cartridge 9 mm Luger cartridge. Based on her examination, she concluded that the round was cycled through the firearm that fired the three cartridge cases. She explained that "at some point in time this round had been inside the same firearm that fired these three cartridge cases and it had been extracted without being fired."

## G. The Examination of Jeremy Ice

{¶ 32} Jeremy Ice testified that he is employed as a parole officer with the Ohio Adult Parole Authority. The parties stipulated that Kielonte Harris was on post-release control on November 2, 2019, monitored with a GPS ankle monitor.

{¶ 33} On November 2, 2019, police officers asked Ice to run a "proximity report" for a particular address and time; this report would identify if any supervisee with an ankle monitor was in that area at the time. Ice ran the report and noted that there was one supervisee in the area at that time — Kielonte Harris.

{¶ 34} Ice then provided real-time tracking information to law enforcement officers, who arrested Kielonte Harris at a house on Sandusky Avenue in Cleveland on November 2, 2019.

### H. The Examination of Darren Robinson

{¶ 35} Darren Robinson testified that he recently retired as a detective with the crime-scene unit of the Cleveland Police Department. He served in that position for over 20 years, including on November 2, 2019.

{¶ 36} Robinson took photographs and collected evidence from the house on Sandusky Avenue where Kielonte Harris was arrested. The evidence included a pair of "black and white Jordan 23 tennis shoes" and a "black Levi jacket or coat."

{¶ 37} On cross-examination, Robinson admitted that officers did not find a firearm or any ammunition during their search.

{¶ 38} As a detective, Robinson also assisted with the processing of a Toyota Solara owned by David Billingsley (whose testimony is summarized below) on November 29, 2019. Robinson took photographs and collected swabs for potential DNA from various parts of the vehicle.

### I. The Examination of Lisa Przepyszny

{¶ 39} Lisa Przepyszny testified that she is employed as a forensic scientist in the trace evidence department at the Cuyahoga County Regional Forensic Science Laboratory, which is housed in the Cuyahoga County Medical Examiner's Office. The parties stipulated that she is an expert in the field of trace evidence.

{¶ 40} Based on her examination of a red hat worn by Joseph Meeks when he was shot, she determined that the gun that killed him was at least four or five feet, and could have been farther, from him when it was fired.

{¶ 41} Przepyszny also examined the "black Jordan shoes" and "black Levi's coat" recovered from the Sandusky Avenue house. No blood was detected on the coat or shoes. She found two particles that were characteristic of gunshot residue on the lower sleeves of the coat. She concluded that either the sleeves were in proximity of a fired gun or gunshot residue transferred from an object to the sleeves. She swabbed the coat and shoes for DNA.

{¶ 42} On cross-examination, Przepyszny admitted that there were only two particles of gunshot residue — each only around ten microns in diameter — found on the coat sleeves. She further admitted that there are many ways that gunshot residue can transfer onto clothing, in addition to physically handling or manipulating a firearm. Being near a gun that is fired increases the likelihood that one may acquire some of that residue.

{¶ 43} On redirect, Przepyszny testified that it would be reasonably possible for gunshot residue to land on people located within "several feet" of a fired gun.

## J. The Examination of David Scheppegrell

{¶ 44} David Scheppegrell testified that he is employed as a senior vice president with a company called Sentinel Offender Services. A subsidiary of Sentinel manufactures ankle monitors and produces related software; Sentinel contracts with government agencies to provide that technology and related services. At the

time of these murders, Sentinel or its subsidiary had a contract with the state of Ohio to provide ankle-monitor technology and services. The trial court accepted Scheppegrell as an expert in offender tracking.

{¶ 45} Scheppegrell reviewed the data from Kielonte Harris' ankle monitor for November 2, 2019. He mapped the location points in relation to 7802 Lorain Avenue in Cleveland (the crime scene). He identified a number of data points at and near that location, beginning at 3:14:53 a.m.

{¶ 46} Beginning around 3:57:54 a.m., the data showed the monitor traveling at higher speeds, up to 92 miles per hour. The data points move from the area of the crime scene to Interstate 90 and then into downtown Cleveland, stopping at the location of David Billingsley's home.

{¶ 47} After reviewing the relevant data, Scheppegrell concluded that Kielonte Harris' ankle monitor was within Magana's apartment building for at least a portion of the time between 3:00 a.m. and 4:00 a.m. on November 2, 2019.

### K. The Examination of David Billingsley

{¶ 48} The state called David Billingsley and Billingsley refused to answer any questions. The court held Billingsley in contempt and Billingsley was taken into custody. Deandre Harris moved for a mistrial and the court denied the motion.

{¶ 49} Billingsley was recalled for testimony later in the trial. He testified that people call him "Love." On the night of the murders, Billingsley drove "Dutch" to a bar to buy a six-pack of beer and then parked near Magana's apartment, where he and "Dutch" listened to music and drank in his car. While they were sitting in the

car, a person who Billingsley knew as "Tae" walked by with a friend of "Tae's" and waved at them; they waved back. Billingsley identified "Tae" in court as Kielonte Harris. Kielonte and the friend went upstairs to Magana's apartment.

{¶ 50} Billingsley had never seen the friend before and did not know him. Billingsley was asked if he saw Kielonte's friend sitting in the courtroom. Billingsley answered no.

{¶ 51} A few minutes after Kielonte and the friend entered Magana's apartment, "Dutch" exited Billingsley's car and went up to the apartment.

{¶ 52} Minutes passed, and then Kielonte exited the apartment and walked to Billingsley's car. Kielonte asked for a ride to the east side of the city. Billingsley agreed and Kielonte got in the car. The two men sat in the car for a few minutes while Billingsley continued drinking his beer. At that time, a woman who Billingsley knew as "Leila" walked by. Kielonte told Billingsley that "Leila" owed him money. Kielonte opened the car door and called her name, asking her to "come here for a minute." She looked back at him "with a little smug look," then turned around and walked upstairs to Magana's apartment. At that time, Kielonte told Billingsley, "Love, I'll be back."

{¶ 53} Kielonte went to Magana's apartment, leaving Billingsley alone in his car and approximately fifteen minutes later, Billingsley saw Magana's door open and several people — around eight or ten — exit the apartment and descended the stairs "kind of fast." Billingsley asked someone what was going on, but the person did not respond; he kept moving quickly away. A woman Billingsley knew as

"Muriel" came running up to his car and asked if she could get in with him. He agreed, but before she could get in the car, Kielonte's friend — the person whom Billingsley had never seen before and did not know — came up and also asked if he could get in the car. Billingsley agreed. The friend got into the car first; the car only had two seats. Muriel, lacking a seat, remained outside of the vehicle.

{¶ 54} Seconds later, Billingsley saw Kielonte coming toward the car. Kielonte walked near the car but came to a point where Billingsley could no longer see him. Billingsley then heard a gunshot; it sounded like it came from the side of his car, where "Muriel" had been standing. At that point, Billingsley put his car in drive and got ready to pull away. He saw Kielonte leaving the alley in the direction of "Colgate." Billingsley tried to turn right, toward Lorain Avenue, but there was a body lying on the ground in that direction. He backed his car up and went to the left instead. Kielonte's friend told him to drive down an alley. The friend then directed him to stop the car. Billingsley did so. The friend opened his car door and Kielonte got in the car. Kielonte and the friend asked if Billingsley could drive them to the east side of the city. Billingsley said no but offered that they could ride with him back to his house.

{¶ 55} During the trip to Billingsley's home, there was a lot of talking between Kielonte and the friend. Billingsley heard one of them (he did not know which one) say that "we should have taken care of homeboy."

{¶ 56} A few minutes after they arrived at his home, Billingsley left again; he told Kielonte and the friend that he was going for cigarettes. Instead, he drove back

to the area of the apartment, where he learned that someone had been shot. When he returned to his home around 20 minutes later, the two men were gone.

{¶ 57} Billingsley believed that he saw a gun that night. Billingsley said the following:

> [BILLINGSLEY]: * * * I seen the weapon out. I don't know if he was looking at it, cleaning it or what, or just wiping it off or what.
>
> [PROSECUTOR]: Who was * * * wiping it off?
>
> [BILLINGSLEY]: I think — not Tae [Kielonte Harris]. Tae wasn't wiping off. The other defendant, I think he was wiping it off if I'm not mistaken. I think he was either wiping it off or just setting it on the table. It was one of the two.

## L. The Examination of Leila Abdulhalim

{¶ 58} Leila Abdulhalim testified that she attended the party at Magana's apartment on November 2, 2019. Abdulhalim knew Magana because Abdulhalim purchased crack cocaine from Magana. Abdulhalim attended the party with two friends — "Red" and "Muriel."

{¶ 59} "Dutch" was also there, as was his girlfriend. They lived in a room at Magana's apartment.

{¶ 60} Abdulhalim performed a sex act in exchange for money before going to Magana's apartment. When she arrived, Kielonte Harris called out to her from a blue car and "kept wanting me to buy [drugs] from him." She approached the car and saw that there was "a heavy-set guy" driving; she knew this person as "Love." She declined to buy drugs from Kielonte because her plan was to buy drugs from Magana. Kielonte followed Abdulhalim up the stairs to Magana's apartment.

{¶ 61} Kielonte continued "hassling" her in the apartment, so "Dutch" told her to "go in the back room." She continued as follows:

> And as I was trying to go into the back room, Kielonte pulled out a gun. I was right by April. And he told everybody to strip. And they were arguing back and forth. April told him, you are going to bring a gun in my house, you better got the balls to use it. And she licked the tip of the gun. And the next thing I know, the bullet went past my face and hit her right in the head. And I took off.

{¶ 62} Abdulhalim testified that Kielonte shot April. Everybody ran out of the apartment after the shot. Abdulhalim saw two other "guys" with guns that night; she saw them outside on the steps to the apartment but Abdulhalim did not know who they were. She did not see those two people inside the apartment.

{¶ 63} Abdulhalim ran down the steps and saw "Red" in the alley. "Red" and Kielonte were arguing, with "Red" confronting Kielonte about why he shot Magana. As Abdulhalim was running across the street, she heard a gunshot and saw "Red" fall to the ground. Kielonte was standing next to "Red" at the time, still holding a gun.

{¶ 64} On direct examination, when asked to identify Kielonte Harris in the courtroom, Abdulhalim pointed to Deandre Harris. She then reported that she may have made a mistake. When she saw that Kielonte Harris was shorter than Deandre, Abdulhalim corrected herself. She then said she recognized Deandre Harris as a person she has seen in the past, but she said she does not "know him, know him." On cross-examination, Abdulhalim answered as follows:

> [DEFENSE COUNSEL]: And you have never seen that man in the pink suit [Deandre Harris] a day in your life, have you?

[ABDULHALIM]:  I couldn't -- I don't know.

**M. The Examination of Casey Holbert**

{¶ 65} Casey Holbert testified that she was 17 years old on November 2, 2019.  April Magana was "like a mother" to Holbert and the two knew each other Holbert's whole life.  Holbert would go over Magana's house every day, then would go home at night.

{¶ 66} Holbert also knew Kielonte Harris; she "grew up with him basically from the neighborhood."  Kielonte was called "Little Tae."  They used to be very close; there was a time that she considered him to be like a brother.

{¶ 67} In the days leading up to Magana's death, there were two people staying in one of the bedrooms of Magana's apartment — "Dutch" and "Erica."  Magana stayed in the other bedroom.

{¶ 68} On November 2, 2019, there was a house party at Magana's apartment to celebrate the birthday of a person named "Smooth" (Arsenio Coley).  Holbert was present for the party.

{¶ 69} Holbert saw Kielonte Harris walking around on a street near the apartment and at a gas station on the evening before the shooting.  Kielonte was walking around with other people.  Holbert learned that one of the people was called "D-man"; she did not know the other people with whom Kielonte was walking.  She had not seen "D-man" before this night.

{¶ 70} At some point that evening, "D-man" entered Magana's apartment with "multiple people" (she did not know who these people were).  Holbert saw that

"D-man" had a gun "on his hip" when he entered the apartment.  At some point during the party, she saw him put the gun "inside his coat pocket."

{¶ 71} Holbert remembers that there were two arguments during the party that evening.  The first was over money and involved everyone who was there — "Smooth," Holbert, "Big Tae" (Deandre Dent), "D-man," Magana and "Leila and them."

{¶ 72} On cross-examination, Holbert changed her testimony; she said Dent had left before any of the arguing.  Holbert admitted being romantically involved with Dent.

{¶ 73} Shortly after Dent left the apartment, and Kielonte Harris entered the apartment.  "[W]e was talking and doing normal things" for a time, and then a second argument "broke out" in the apartment's living room.  This argument was also over money.  "Leila" was involved in the argument, as was Kielonte.  She heard Kielonte "saying how he was going to take people's money."  She heard Magana ordering people out of her house.

{¶ 74} Holbert went into the apartment's kitchen as the argument "just got louder and louder."  "D-man" was in the kitchen during this argument, too.

{¶ 75} During the argument, Holbert heard gunshots in the living room.  She could not observe the argument from her vantage point in the kitchen and did not know "who shot who."

{¶ 76} When the shooting started, "D-man" grabbed Holbert's hair "from the back" and began pulling her, trying to get out of the apartment.  Holbert could

hear that he was talking but could not understand what he was saying. She exited the apartment and tripped. After she got up, she ran toward her sister's house. She heard more gunshots coming from outside the apartment as she ran "past Colgate." She looked back and saw a body lying on the ground. She continued on to her sister's house.

{¶ 77} Holbert did not interact with Kielonte or "D-man" after she left the apartment; she does not know where either person went.

{¶ 78} Holbert recalled seeing "Love" drinking alcohol in a car parked behind Magana's apartment. She also saw his car as she ran away from Magana's apartment after the shooting.

{¶ 79} Holbert knew of a person named "Red"; he was "always" hanging out in the alleyway outside Magana's apartment. She saw "Red" outside the apartment on the night of the shooting; she never saw him inside the apartment that night.

{¶ 80} On cross-examination, she changed her testimony. She said that "Red" brought a "white guy" (whom she did not know) to the apartment that night. There was then an argument between "Red" and the "white guy" that got so heated that "Red" held the "white guy" up against a wall such that his feet were dangling. The argument concerned a plan for Magana to use an ATM card belonging to the "white guy" to obtain money for drugs. On redirect, Holbert testified that this confrontation was hours before the shooting.

{¶ 81} Holbert identified Deandre Harris in the courtroom as "D-man." Holbert identified a lineup of photographs that police showed her on November 12, 2019. At that time, she also identified Deandre Harris as "D-man."

{¶ 82} Holbert admitted that when she was initially interviewed by police, she tried to convince them that she was not at the party that night. She said she lied because she "was scared for [her] life."

{¶ 83} On cross-examination, Holbert admitted that she previously told police that Kielonte Harris was not at the party and she only saw him on the street outside. She also originally said that she went home to be with her daughter at midnight that night, before the shooting. After speaking with detectives, and after detectives threatened to charge her with crimes, Holbert changed her story. Even then, she said that the argument began when Magana beat Kielonte at cards. On redirect, Holbert said that her testimony in court was the truth.

### N. The Examination of Arsenio Coley

{¶ 84} Arsenio Coley, who goes by the nickname "Smooth," testified that he has used heroin, methamphetamine and crack cocaine for over ten years. On November 2, 2019, Coley attended a party at Magana's apartment. Coley estimated that he had been using drugs and staying around the building from October 31 through November 2, 2019.

{¶ 85} Coley saw that there were a lot of people in and out of the apartment during the party. The people at the party were "[g]etting high," smoking crack cocaine and having sex. He knew several people there, including "Dutch." Coley

recognized that "Dutch's" girlfriend was there, too. Coley also knew April Magana, with whom Coley had used drugs and had sex. "Red" was also there, and Coley and "Red" were "getting high together."

{¶ 86} On cross-examination, Coley admitted that there were "10 to 12" people in the apartment on the night of the shooting, "at least."

{¶ 87} In the early morning hours of November 2, 2019, there was a shooting at the apartment. Coley jumped out a second-story window, ran away and got picked up by someone and taken home. He later called 911 to offer information about the incident.

{¶ 88} Coley denied knowing the identity of a person called "D-man."

**O. The Examination of Timothy Clark**

{¶ 89} Timothy Clark testified that in 2019 he was employed as a special investigator by the Cuyahoga County Prosecutor's Office. Clark assisted with digital forensics during the investigation into the deaths of Magana, Meeks and Tursivio. Specifically, Clark completed a digital extraction of data contained on an iPhone owned by Deandre Harris.

{¶ 90} Clark testified that the cell phone contained location data recording that the phone was in the area of West 80th Street and Elton Court (near the intersection of Lorain Avenue and West 78th Street) at 3:02 a.m. on November 2, 2019. The phone recorded "activity" data indicating that the phone climbed two floors' worth of stairs five times between 3:12 a.m. and 3:55 a.m. that morning. The

phone recorded "activity" data indicating that the phone climbed one flight of stairs at 4:08 a.m.

{¶ 91} On cross-examination, Clark admitted that he has "no idea" how a cell phone records how many steps a person takes or how many floors a person has climbed. He further admitted that the latitude and longitude data for the cell phone at 3:02 a.m. corresponded with an address on West 80th Street in Cleveland. He further admitted that he did not know why, in one instance, the phone recorded 244 steps and a distance traveled of 142 meters but did not register a change in latitude or longitude. He further admitted that he did not know why, in another instance, the phone recorded two different locations at the same time. The second location was in the area of West 102nd Street and West Boulevard, relatively far from the intersection of West 78th and Lorain.

**P. The Examination of Tom Ciula**

{¶ 92} Tom Ciula testified that he is employed as a forensic video specialist by the Cleveland Division of Police. Ciula collected surveillance video from a building across the street from the site of the homicides and also collected surveillance video from Izzo's Cafe, a business located on Lorain Avenue.

{¶ 93} Ciula analyzed the surveillance video to "see if there were any similarities" between people observed at the site of the homicides and people observed at Izzo's Cafe earlier in the evening before the homicides.

{¶ 94} Ciula indicated that three people arrived at Izzo's Cafe in a car at approximately 1:51 a.m. One of them wore pants with distinctive patterning — the

pants had two lighter areas, one on the front of each leg. The pants also had two lighter areas on the back on each leg.

{¶ 95} The state played the surveillance videos from Izzo's Cafe and from across the street from the crime scene. The video taken from across the street captured Meeks' death. Ciula identified that the individual who shot Meeks in the street also appeared to have the same distinctive patterning on their pants as seen on the individual at Izzo's Cafe.

### Q. The Examination of Jeff Oblock

{¶ 96} Jeff Oblock testified that he is employed by the Cuyahoga County Regional Forensic Science Laboratory as a DNA analyst. Oblock described his training and experience and the court accepted him as an expert in the field of DNA analysis.

{¶ 97} Oblock performed DNA analysis on swabs taken from the bodies of the three victims in the case and compared those with reference samples from Kielonte Harris and Deandre Harris.

{¶ 98} Neither Kielonte Harris' nor Deandre Harris' DNA was found on any of the victims, on the cartridge or cartridge cases recovered from the crime scene or in Billingsley's car nor was either of their DNA found on other items found at the crime scene — a glove, a cigar tip, a cigarette lighter, pocket change or anything else.

{¶ 99} The DNA on the black coat matched to Kielonte Harris and one unknown contributor. The DNA on the black shoes matched to Kielonte Harris and

two unknown contributors. Deandre Harris was excluded as a contributor to either piece of clothing.

### R. The Examination of Aaron Reese

{¶ 100} Aaron Reese testified that he is employed as a detective sergeant with the Cleveland Police Department and was involved in the investigation of this case.

{¶ 101} The state played a portion of a recorded phone call made by Deandre Harris from pretrial detention on October 13, 2022.[2] In relevant part, in the recording Deandre stated that he saw three people get shot in front of him. Detective Reese testified that he interviewed Deandre Harris in connection with this investigation; Reese identified Deandre Harris in the courtroom.

{¶ 102} Detective Reese testified that Deandre Harris is recorded in the surveillance video from Izzo's Cafe and there are times in the video that Deandre and Kielonte were together. Reese reviewed the surveillance video from West 78th Street and Lorain with Deandre during their interview.

---

[2] The recording itself is not in the record on appeal. It is the appellant's duty to ensure the completeness of the record on appeal. *E.g.*, *O'Donnell v. Northeast Ohio Neighborhood Health Servs.*, 8th Dist. Cuyahoga No. 108541, 2020-Ohio-1609, ¶ 75, fn. 6 ("The appellant has a duty to ensure that the record relating to his or her assignments of error is complete."); *Pietrangelo v. Hudson*, 2019-Ohio-1988, 136 N.E.3d 867, ¶ 22 (8th Dist.) ("It is the appellant's duty to ensure that [this court is provided] with all of the information needed to decide an assignment of error."). Accordingly, we must presume that this exhibit is consistent with the testimony describing the exhibit at trial.

## S. The Examination of Arthur Echols

{¶ 103} Arthur Echols testified that he is employed as a police detective in Cleveland's homicide unit. He has been in that role for 14 years. Echols responded to the crime scene at West 78th and Lorain Avenue on November 2, 2019.

{¶ 104} Police had detained Weaver Jones and his girlfriend Erica Vaultman by the time Echols arrived on scene. Echols interviewed Jones and Vaultman that morning; he also interviewed Arsenio Coley, who had driven himself to the police station to provide information about the shootings. After those interviews, police identified Kielonte Harris as a person of interest in the shootings. Police then contacted the Adult Parole Authority and learned that Harris' ankle monitor was in the area of the crime scene around the time of the murders. Police then obtained an arrest warrant for Kielonte Harris and effectuated that arrest. Detective Echols interviewed Kielonte.

{¶ 105} On cross-examination, Detective Echols admitted that the description police were initially provided was that the shooter wore braided hair, and Kielonte Harris was not wearing braided hair in the surveillance videos or when he was interviewed after his arrest on the day of the shooting.

{¶ 106} Echols testified that David Billingsley lived at Lakeview Terrace. He related that there is a data location pin from Kielonte's ankle monitor at that location at 4:07:53 a.m. on November 2, 2019.

{¶ 107} Echols interviewed Casey Holbert and, based on that interview, Echols compiled a photograph lineup with respect to another person of interest in the investigation. Holbert identified Deandre Harris from that photograph lineup.

{¶ 108} On cross-examination, Detective Echols admitted that at the time he completed his original report on November 10, 2019, Deandre Harris had not been mentioned in connection with these crimes, despite police having interviewed Casey Holbert, Arsenio Coley, Weaver Jones, Katherine Green, Erica Vaultman and Kielonte Harris. Detective Echols did not mention that there was even a second person of interest in this report, despite these witness interviews and despite the fact that Detective Echols had reviewed the surveillance video from the bar and from Lorain Avenue and "all the video that you have now" before authoring that report. On redirect, Echols testified that he knew the nickname "D-man" at the time he wrote this initial report.

{¶ 109} Detective Echols further admitted that when Holbert first mentioned Deandre Harris to police, she reported that he did not let her leave the apartment.

{¶ 110} There came a time in November 2019 that Deandre Harris was arrested and interviewed by detectives.

{¶ 111} On recross-examination from Deandre Harris' counsel, Detective Echols admitted as follows:

> [DEFENSE COUNSEL]: Dutch or Weaver Jones has been a fugitive
> since earlier this year?

[DETECTIVE ECHOLS]: Yes, ma'am. April of this year.

[DEFENSE COUNSEL]: And you have no information that Dutch was responsible for putting a bullet in the head of Magana, Tursivio, or Meeks?

[DETECTIVE ECHOLS]: No, ma'am.

[DEFENSE COUNSEL]: And you don't have any information that DeAndre Harris was responsible for that either, do you?

[DETECTIVE ECHOLS]: That is correct.

**T. Verdict**

{¶ 112} After the state's case-in-chief, Deandre Harris moved for acquittal under Crim.R. 29. The court granted the motion as to every count except for the two having weapons while under disability counts.

{¶ 113} Deandre Harris did not present any evidence.

{¶ 114} After the close of evidence, Deandre Harris renewed his Crim.R. 29 motion with respect to the two having weapons while under disability counts. The trial court denied the motion and, in doing so, engaged in the following dialogue with Deandre Harris' defense counsel:

> [DEFENSE COUNSEL]: I can't imagine that this Court would rely on the testimony or the advice of Casey Holbert in making any decision in your life, let alone the most important of your affairs. * * * [T]he only testimony that puts a weapon on DeAndre Harris * * * is the testimony of Casey Holbert. * * * That young woman, who is the sole piece of evidence to support convictions * * * spent over an hour or approximately an hour of her life, my life, your life, [the prosecutor's] life, desecrating this sacred room to which we have all dedicated our adult lives to serving.
>
> She slumped in her chair so much, I basically had to sit on [a detective's] lap to watch her testify. She was hostile with every single

person who asked her questions. She admitted to telling multiple lies. * * * [H]er weight and credibility should be basically nonexistent.

* * *

[THE COURT]: Well, here, so I agree with just about everything else that has been said about Ms. Holbert; her demeanor on the stand, what she testified to, how she testified. * * * And I will say for the record, I find two things that were relatively significant for me, which is that all of her answers, whether on direct or cross, were sort of unwillingly given. As [Deandre Harris' counsel] pointed out, to [Kielonte Harris' counsel's] questions she was somewhat combative and argumentative in her demeanor, the way she sat, and so forth. But when it came to the question about the gun, she was pretty direct on that.

The other thing I find really significant is not just that the statement was that he had a gun or not, but that he specifically pulled it out of his waistband and put it into his pocket. To me, that is indicia of reliability and truth of why would you say that if it weren't otherwise true.

{¶ 115} The trial court found Harris guilty on both counts — each a third-degree felony violation of R.C. 2923.13(A)(3)) — along with the one-year, 18-month, three-year and 54-month firearm specifications attached to each count. R.C. 2941.141(A), (D); R.C. 2941.145(A), (D).

### U. Sentencing and Appeal

{¶ 116} At sentencing, the state conceded that the two having weapons while under disability counts were allied offenses of similar import and, further, that the firearm specifications on each count were of similar import. The state elected to proceed to sentencing on Count 18 with the attached 54-month firearm specification. The state, the defense, Harris and members of Harris' family addressed the court. The court then imposed a sentence of nine months in prison

on the underlying felony and 54-months on the firearm specification, to be served consecutively.[3]

{¶ 117} Harris appealed, raising the following assignment of error for review:

> The convictions for counts eighteen and nineteen were against the manifest weight of the evidence.

## II.   Law and Analysis

{¶ 118} Harris argues that his convictions for having weapons while under disability were against the manifest weight of the evidence. While he challenges both counts of conviction, any error with respect to the manifest weight of the evidence on the second count — Count 19 — is harmless beyond a reasonable doubt because that count merged into Count 18 at sentencing. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14 ("When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *."), citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990); *see also State v. Newberry*, 8th Dist. Cuyahoga No. 111431, 2023-Ohio-3623, ¶ 202–203.

---

[3] The original sentencing journal entry contained a clerical error related to the assessment of costs and fees against Harris. The error was corrected through a nunc pro tunc entry journalized on August 22, 2023.

{¶ 119} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *See State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 120} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 121} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g.*, *State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence and direct evidence have "equal evidentiary

value." *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 122} A person commits the crime of having weapons while under disability by knowingly acquiring, having, carrying or using any firearm if the person has been convicted of certain felony offenses. R.C. 2923.13(A)(3). In order to "have" a firearm, an individual must either actually or constructively possess it. *E.g.*, *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 16.

{¶ 123} The 54-month firearm specification attached to the count alleged that Deandre Harris (1) had a firearm on or about his person or under his control and (2) displayed the firearm, brandished the firearm, indicated that he possessed a firearm, or used the firearm to facilitate the offense and (3) previously had been convicted of or pleaded guilty to an enumerated firearm specification.

{¶ 124} Harris makes no argument that he did not have a previous conviction disqualifying him from possessing a firearm. He does not argue that his previous conviction lacked an enumerated firearm specification. And he does not argue that Casey Holbert's testimony (that Harris had a firearm on his hip and moved the firearm from his hip to a coat pocket) is not enough, even if believed, to qualify as displaying, brandishing, indicating that he possessed a gun or using a firearm to facilitate an offense.

{¶ 125} His argument in the trial court and on appeal is that he did not have a firearm that night, period. Harris contends that the only evidence supporting the conviction was the testimony of Casey Holbert, which he says was clearly not

credible. He points out that Holbert was a reluctant witness and was disrespectful to the proceedings while on the stand. He further claims that Holbert admitted to lying to the police during the course of the investigation and was not completely forthcoming during her direct examination. He asks this court to vacate his convictions.

{¶ 126} There were certainly some inconsistencies in the state's case against Deandre Harris. The state asserted that he was the "friend" who rode with Kielonte Harris in David Billingsley's car — the person Billingsley said he saw wiping down a gun at his house. There is some evidence to support that assertion and Billingsley referred to this person the "other defendant" (as opposed to Kielonte Harris). Yet, the state did not clarify what Billingsley meant by this and Billingsley said he did not see the friend in the courtroom.

{¶ 127} The state further contended that Deandre Harris held Casey Holbert by her hair when the first shot was fired, preventing her from leaving the apartment. But she actually testified that he pulled her by the hair out of the apartment, away from the gunfire. The trial court detailed on the record its findings with respect to Holbert's credibility, largely agreeing that her demeanor was disrespectful and her testimony reluctantly given.

{¶ 128} Harris argued his defense to the trial court and the court was free to reject any portion of the state's evidence or witness testimony that was inconsistent or otherwise unreliable. The court's acquittal on nearly every charge against Deandre Harris shows that it did not accept the state's theory of the case, wholesale.

**{¶ 129}** The transcript demonstrates that the trial court was persuaded by the directness and detail of Holbert's testimony about Deandre Harris' firearm on the night of the shooting. It chose to believe that Holbert saw Deandre Harris with a gun and saw him move it from his waistband to his coat pocket. Deandre Harris points to no evidence that contradicts this testimony. To the contrary, the other evidence in the case tends to corroborate aspects of her testimony.

**{¶ 130}** That Deandre Harris was present in Magana's apartment at the time of the shooting, as Holbert testified, is corroborated by surveillance video, cell phone location data and Deandre Harris' own statement that he witnessed the murders. Holbert identified Deandre as "D-man" in a photograph lineup near the time of the shooting and identified him again in court. While Leila Abdulhalim did not know Deandre Harris and could not be sure whether she had ever seen him before, she did say that she saw two people with guns that night, in addition to Kielonte Harris. Deandre Harris and Kielonte Harris were at Izzo's Cafe together earlier in the evening and were seen together on the street and at a gas station outside the apartment before the shooting, and David Billingsley identified that he saw one of Kielonte Harris' friends wiping down a gun.

**{¶ 131}** Holbert's direct testimony stands uncontradicted and partially corroborated by other evidence. After a thorough review of the record, and after considering Harris' appellate arguments, we cannot say that this is the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 132} We, therefore, overrule Harris' assignment of error.

## III. Conclusion

{¶ 133} Having overruled Harris' sole assignment of error for the reasons stated above, we affirm.

It is ordered that the appellee recover from the appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR